## SHREVE et al. v. UNITED STATES.

### No. 8781.

Circuit Court of Appeals, Ninth Circuit.

April 18, 1939.

Rehearing Denied May 22, 1939.

798

Leslie C. Hardy and Louis B. Whitney, both of Phoenix, Ariz. (George H. Shreve, of Los Angeles, Cal., and Elliott, Hardy & Glenn, of Phoenix, Ariz., on the brief), for appellants.

F. E. Flynn, U. S. Atty., of Phoenix, Ariz., and K. Berry Peterson, Asst. U. S. Atty., of Tucson, Ariz.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

GARRECHT, Circuit Judge.

The appellants were indicted December 22, 1933, along with Daniel H. Shreve, Glen O. Perkins, and W. E. Evans, for violation of Section 215 of the Criminal Code of the United States, 18 U.S.C.A. § 338, commonly called the mail fraud statute, and Section 37 of said Code, 18 U.S. C.A. § 88, the conspiracy statute. The indictment was drawn in twelve counts, one, to and including eleven, charging specific offenses, and count twelve, conspiracy.

On February 13, 1934, the cause came on for trial and defendants Jesse H. Shreve, Archie C. Shreve and Daniel H. Shreve were convicted upon the first eleven counts of the indictment, the jury disagreeing upon the twelfth count; the defendant Glen O. Perkins was convicted upon the first four counts of the indictment; and the defendant W. C. Evans was convicted upon counts one and four of the indictment.

The defendants appealed to this court and the judgments were reversed and the cause remanded for a new trial, 9 Cir., 77 F.2d 2.

Defendant Daniel H. Shreve died prior to the retrial of the case and as to him the indictment was abated. The indictment was dismissed as against the defendant W. C. Evans, and a motion for severance was made by defendant Glen O. Perkins, and granted. The new trial proceeded as to defendants Jesse H. Shreve and Archie C. Shreve. Upon motion of the United States Attorney, the twelfth (conspiracy) count of the indictment was dismissed. The jury returned a verdict of guilty on all eleven counts against both defendants, and judgments were entered thereon, and defendants appeal. Thirty-five errors are assigned, comprising 53 pages of a tran-

script of record of 961 printed pages, and all but three assignments are relied upon.

A somewhat extended recital of background is necessary for a proper understanding of the issues involved. Glen O. Perkins went to Arizona in 1928 to organize a corporation to be known as the Arizona Holding Corporation for the purpose of raising the sum of $50,000 required to be deposited with the Arizona State Banking Department to secure a charter for a building and loan association. Perkins and others, namely, Portman, Love, Hunter, and Drs. Thomas and Morris, retained an attorney who prepared and filed the articles of incorporation and made application for permit to sell securities and stock. At the first meeting of the board of directors of the Arizona Holding Corporation, the following were elected: L. C. James, president; Dr. Charles A. Thomas, Dr. Bascom F. Morris, and E. L. Anderson, all of Tucson, Arizona, directors. The record does not show that Perkins, Portman, Love or Hunter were directors. There was testimony that Love and Portman came to Tucson, Arizona, from San Diego, Calif. One John C. Hobbs came to Tucson from San Diego, with Perkins, but had arrived after the organization of Arizona Holding Corporation. Hobbs and Perkins raised $35,000 by selling stock in the corporation to a number of people. Directors James, Dr. Thomas and Dr. Morris, each agreed with Perkins and Hobbs to pay in or deposit $5,000 each when the sum of $35,000 had been collected and they borrowed $15,000 from a bank to fulfill their part of the bargain, but the bank would not release the money until certain notes were paid.

Perkins and Hobbs rented an office on the ground floor of the Santa Rita Hotel in Tucson. Archie C. Shreve was employed at the time by The Southwestern Union Securities Corporation, which owned the controlling interest in the Santa Rita Hotel. He had known Perkins in San Diego, Calif. Archie Shreve testified that Perkins and Hobbs sought to interest him in the purchase of stock in the Arizona Holding Corporation in February, 1929 and revealed to him their plan to organize a building and loan association, but he did not purchase any stock at that time. Perkins testified, however, that the conversation took place in the latter part of 1928 and that Archie Shreve had then intimated to him that his group, which was then interested in a building and loan association in California, might be induced to share in a similar undertaking in Arizona. Perkins also stated that before James and Drs. Thomas and Morris had signed the agreement above referred to he had talked with Jesse H. Shreve in San Diego relative to the Arizona Holding Corporation or the Security Building and Loan Association. After numerous meetings with Perkins and Hobbs, and upon their solicitation, Jesse Shreve agreed to invest money in the venture, provided he should be given control. Early in March, 1929, upon Jesse Shreve paying off the $15,000 note at the Consolidated Bank in Tucson, James and Drs. Thomas and Morris resigned from the Board of Directors and other persons from San Diego were elected to the board of directors at the behest of Jesse Shreve. Until that time, neither Jesse nor Archie Shreve had any connection with the stock selling campaign for the Arizona Holding Corporation. Thereafter, the Security Building and Loan Association was organized and the sum of $50,000 deposited with the State Banking Department.

The Security Building and Loan Association opened its office in the Santa Rita Hotel Building in Tucson, in March, 1929, with a Mr. Cash in charge and Hobbs and Perkins as employees, Hobbs in the office and Perkins as an outside solicitor. Business in Tucson proved rather slow for the Building and Loan Association and, in November, 1929, an office was opened in the Adams Hotel Building in Phoenix, Arizona. Archie Shreve testified that Perkins was in charge of this office, but Perkins testified that Archie Shreve took charge when the office was opened and that he (Perkins) worked out of that office as a salesman on a salary of $400 a month. Archie Shreve gave testimony that at about this time Perkins stated the Arizona Holding Corporation was not doing well, that Perkins did not like the way it was organized and he asked Shreve to handle the organization of a new company to succeed the Arizona Holding Corporation. Shreve further testified that through Perkins, himself, and others, a new holding corporation, the Century Investment Trust, was organized to succeed the Arizona Holding Corporation and take over its holdings, particularly the Building and Loan Association. Along about this time Cash resigned as the active head of the Building and Loan Association, although

he remained a director and officer of the Association for some time thereafter, and Hobbs was placed in charge.

About September 1, 1931, the Security Building and Loan Association began to have trouble meeting withdrawals, and was not able in all cases to fill requests for withdrawals because of lack of money; funds were transferred between the Tucson and Phoenix offices. Hobbs and Perkins visited Jesse Shreve in San Diego about 30 days before the actual closing of the Security Building and Loan Association, and at that time it was decided to liquidate the Association.

Within a week preceding the closing of the Association, the State Bank Examiner threatened to force it to cease operating unless satisfactory arrangements would be made to comply with his demand that $50,000 be put into the Association. Jesse Shreve instructed Perkins to telephone from San Francisco to inform the State Bank Examiner Ellery that he would furnish the required $50,000. Following this conversation Jesse Shreve came to Tucson and called upon the State Superintendent of Banks. Perkins testified that Jesse Shreve then told him the matter had been adjusted with the state banking department and that it was necessary to deposit a note and additional collateral. By this arrangement the Century Investment Trust was to purchase the assets of the Building and Loan Association for the sum of $250,427.45, and give its note therefor, secured by "mortgages and contracts on real estate as per list attached." The note was signed by Century Investment Trust, by D. H. Shreve, President, and by Glen O. Perkins, Secretary. The D. H. Shreve appearing on the note was Daniel H. Shreve, brother of the appellants, who was named as a defendant in the indictment but died before retrial of the case. Daniel Shreve had been brought into the business by Jesse Shreve early in 1930.

Approximately two years after its organization, Security Building and Loan Association ended in insolvency and receivership. A like fate befell Arizona Holding Corporation and the Century Investment Trust.

Upon the first appeal we outlined the indictment as follows (77 F.2d 2, 4): "The scheme charged in the first count of the indictment is one to organize a building and loan association under the laws of the state of Arizona, to be known as the Security Building & Loan Association. It is alleged that in order to secure business for this association defendants planned to make certain false pretenses, representations, and promises with reference to the financial stability of said building and loan association; its guaranteed capital; its intention to pay 6 per cent. interest; its promise to allow deposits to be withdrawn at any time; its intention to invest the funds of the association in sound first mortgages on improved real estate, and that $300,000 of the capital of the corporation had been paid in. It is alleged that by means of these representations large sums of money were obtained and that in pursuance of the plan certain letters set out in the first three counts of the indictment were mailed. The fourth count charges a scheme to defraud by the incorporation of the Century Investment Trust and the Arizona Holding Corporation, both under the laws of the state of Arizona; that large amounts of stock of these two corporations would be sold to the public upon certain false representations and promises, among others, that the Century Investment Trust was solvent, that it was doing a large and profitable business, that it had net earnings, and net income for the payment of dividends; that the defendants would pretend dividends would be paid from the earnings whereas they were not to be so paid but were to be paid and were paid from funds supplied to the Century Investment Trust by the defendants. Counts 5, 6, 7, 8, 9, and 10 allege the mailing of letters in furtherance of this second scheme to defraud, and the twelfth count alleges conspiracy, as above stated."

The eleventh count also alleges mailing of a letter in furtherance of the second scheme to defraud.

The Government sought to prove that the Arizona Holding Corporation, Century Investment Trust, and Security Building & Loan Association were managed or controlled by the persons named in the indictment, and John C. Hobbs, who was not indicted; that a statement of condition of the Security Building & Loan Association, mailed to one Fred Sweetland, was false, particularly as to the item of surplus and undivided profits; that the corporations named in the indictment were insolvent and representations made by defendants

with respect to the financial condition of those corporations were false.

In view of the excessive size of the record, it will be impossible to set forth in detail, in an opinion such as this, all of the evidence contained in the bill of exceptions. Sufficient thereof, however, will be stated to illustrate the decision on the various points urged by the appellants as ground for reversal.

First: Appellants contend "the indictment is duplicitous in that the fraudulent schemes, as alleged in counts one and four of the indictment are interwoven, and the several counts of the indictment are joined." This point was raised in the trial court by special demurrer, which was overruled. Appellants make much of the use of the words, in the first count of the indictment, "hereinafter referred to," "as hereinafter in the several counts," and "hereinafter set forth," asserting that the word "hereinafter" should have been limited by the use of the words "in this count" or "in this and the next two counts." Appellants attempt to point out that the word "hereinafter," without more, links *all* counts together instead of only the first three counts of the indictment. There is no merit in this contention and we are unable to understand how a defendant could be misled upon a reading of the entire indictment, for it is obvious that the words, as used, referred only to the first three counts.

At the conclusion of the opinion upon the earlier appeal we said (77 F.2d 2, 9): "the defendants are clearly entitled to a bill of particulars before the retrial of the case." The defendants filed a demand for bill of particulars, listing 22 separate demands. The Government filed a bill, listing the questions and answers seriatim, to which the defendants filed objections and a motion to supplement the bill, which the trial court denied.

■ Before this bill of particulars was demanded and filed, this case had already been once tried and appealed and, in addition, even prior to that time testimony had been taken under an indictment dated February 22, 1933, to which a demurrer was sustained during the taking of testimony on the trial. In view of the fact that the case had theretofore been completely tried, the bill of particulars furnished must be held sufficiently full and definite to have informed the defendants with reasonable detail and completeness of the charges

they were to meet. As to certain requests defendants were referred to the transcript of the former trial, this would appear to be sufficient compliance, for defendants must be presumed to have knowledge of the things which transpired in their presence on the former trials. The bill was not defective by reason of reference to the transcript of a former trial. Cf. Ciafirdini v. United States, 4 Cir., 266 F. 471, 473.

■ The granting of a bill of particulars rests in the sound discretion of the trial court, and its action thereon is subject to review only for abuse of discretion. Dunlop v. United States, 165 U.S. 486, 491, 17 S.Ct. 375, 41 L.Ed. 799; Rosen v. United States, 161 U.S. 29, 40, 16 S.Ct. 434, 40 L.Ed. 606; Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 71 L.Ed. 545; Longsdorf Cyc. Fed.Proc., vol. 5, § 2117, p. 574, § 2118, p. 575.

■ Next, appellants contend: "The trial court erred in permitting Government's witness Fierstone to testify that stock of Security Building and Loan Association held by Century Investment Trust valued at $99,457.50 was charged off as a loss on December 16, 1931, because that is a transaction which occurred after the last date of any indictment letter or printed matter, and because it occurred subsequent to the date any scheme was executed as fixed by the bill of particulars."

C. K. Fierstone, a Special Agent for the Federal Bureau of Investigation, audited the books of the Security Building & Loan Association, Arizona Holding Corporation, and Century Investment Trust. Testifying as to the books of the Century Investment Trust, Fierstone said, "* * * and on December 16th, 1931—," to which counsel for defendants objected upon the ground that transactions after October 24, 1931, were "not within the confines of the Bill of Particulars or the indictment." The court permitted the witness to answer, and he continued: "On December 16, 1931, the stock of the Guardian Western Company [of San Diego—not named in the Bill or the indictment], then being valued at $845,000.00, was sold along with the other assets of the company to the Arizona Holding Corporation, this stock being sold for $231,145.05. That $231,145.05 was the purchase of this Guardian Western stock. Well, at that time the assets of Century Investment Trust were sold to the Arizona Holding Corporation and the liabilities were trans-

ferred, and the Century Investment Trust received a note from the Arizona Holding Corporation for the difference between the two, amounting to $250,000.00. The books do not record anywhere the payment of the note of the Arizona Holding Corporation to the Century Investment Trust. I believe that is still an asset of the company." Thereupon the following occurred:

"Mr. Flynn. Now, can you tell from the books, Mr. Fierstone, what became of the stock of the Building & Loan Association which was held by the Century Investment Trust?

"The Witness. On December 16th, 1931, it was being carried at a valuation of——

"Mr. Hardy. Now, we make that same objection, your Honor. It is a transaction which occurred after the last date in the Bill of Particulars.

"The Court. He may answer.

"Mr. Hardy. Exception.

"The Witness. On December 16th, 1931, it was being carried at a valuation of $99,457.50 and on that date was charged off as a loss.

"The Witness continuing. The books show it was originally purchased on November 15th, 1929, for $60,000.00. Referring to how the books record the value of that stock, it was built up to $99,457.50."

The appellants say in their brief: "This testimony with respect to this large item of loss, involving as it does the three corporations named in the indictment, went, therefore, to prove the insolvency of those corporations as alleged in the indictment." The appellants contend that the court, in admitting the testimony objected to, did not limit the Government in its evidence to those facts set forth in the bill of particulars.

The trial court instructed the jury "that all of the evidence received in this case of facts and circumstances which occurred subsequent to said date [October 24, 1931] can only be considered by you as to the said first eleven counts of the indictment for the purpose of determining the intent of the defendants." But the appellants further contend, notwithstanding this instruction, that they were entitled to be advised as to what evidence the Government would offer to prove intent.

█ Limited, as it was, by the instruction of the court, to the question of intent, this testimony was clearly admissible for that purpose. Intent is a state of mind difficult of precise proof and, therefore, evidence of other and surrounding circumstances may be received for the purpose of proving such intent. Acts done and declarations made after the act of which the defendant is accused are admissible as bearing on intent. Kulp v. United States, 3 Cir., 210 F. 249, 251. See also Samuels v. United States, 8 Cir., 232 F. 536, 541, 542, Ann. Cas.1917A, 711; Greenleaf on Evidence, 16th ed., vol. 3, § 15, p. 21; Jones, Comm. on Evidence, 2d ed., vol. 2, § 624, p. 1160, § 632, p. 1175; Zoline's Fed. Crim. Law & Proc., vol. 1, § 358, p. 297–298. Interesting academically are Wigmore, The Science of Judicial Proof, 3d ed., § 119, p. 219, and Holmes, The Common Law, p. 53.

We next consider a number of assignments of error which are argued at considerable length and with much fervor. The testimony leading up to the questions objected to, and the grounds urged for the objections and the exceptions taken are as follows:

As to assignment 3. The witness Archie C. Shreve testified on direct examination:

"At or about the time the Century Investment Trust and Security Building and Loan Association opened offices in Phoenix, I had a conversation with regard to the future business of those corporations at the office of the Security Building and Loan Association and the Century Investment Trust, in the Adams Hotel Building, here in Phoenix. My brother J. H. Shreve, Glen O. Perkins and myself were present at that conversation. To the best of my recollection, it was said at that meeting that the companies had opened for business, including the Building and Loan Association at Phoenix, and things were not going so well. It was soon after the so-called great crash in 1929 and my brother J. H. Shreve came over to Phoenix from San Diego and stated that——

"Mr. Flynn. Just a minute. At this time, your Honor, we object to the conversation between the defendants, for the reason that it is inadmissible. It is a self-serving conversation between the defendants in this case.

"The Court. Yes, purely self-serving.

"The Court. If you want to get in a statement in the record that Perkins made, that is different. Conversations between these people are purely self-serving.

"Mr. Hardy. Not as between persons who had a conversation at which the witness Perkins was present your Honor.

"The Court. I say, if you want to get into the record Perkins' testimony——

"Mr. Hardy. Associate him with the companies. All right. Q. What was said to Mr. Perkins at that time?

"Mr. Flynn. Object to that, no foundation is laid for it; no impeaching question was asked Mr. Perkins about any such conversation when he was on the stand.

"The Court. I don't recall.

"Mr. Hardy. Certainly, Mr. Perkins testified about a conversation which he had with both Archie Shreve and J. H. Shreve.

"The Court. All right, you have your conversation.

"Mr. Hardy. For the purpose of the record, may we have an exception, and I will try to ask another question.

"The Court. Yes, indeed.

"Mr. Hardy. Q. Now, you have stated that about this time there was a conference between Glen O. Perkins, J. H. Shreve and yourself? A. There was.

"Q. At Phoenix, Arizona? A. Yes, sir.

"Q. Was this conversation directed to Mr. Perkins, or did it, in any way, involve him with respect to a connection with either the Century Investment Trust or the Security Building and Loan Association? A. It did, and about the conduct of this business.

"Q. Now, state it.

"Mr. Flynn. Object to it on the ground it is self-serving.

"The Court. You are right back where you started from.

"Mr. Hardy. Your Honor ruled that the question may not be answered?

"The Court. I ruled that it is purely self-serving.

"Mr. Hardy. Exception.

"(The witness continuing). Mr. Perkins at that time had a conversation with me, or J. H. Shreve in my presence.

"Q. What was that conversation?

"Mr. Flynn. We object on the ground there is no foundation laid for any impeaching statement as to Mr. Perkins' statement, no impeaching question having been asked him at the time he was on the stand, and it is self-serving.

"Mr. Hardy. It is not laid for the purpose of impeachment. The question was asked and predicated in regard to future business of the Century Investment Trust and the Arizona Holding Corporation. It is not asked for the purpose of impeaching——

"Mr. Flynn. Well, it would be immaterial. .

"The Court. Well, it would only be self-serving.

"Mr. Hardy. The conversation Mr. Perkins had with either of these defendants?

"The Court. Well, if you want to impeach the witness, you have to lay the foundation for it always.

"Mr. Hardy. I understand that.

"The Court. Well, I am not going to argue with you.

"Mr. Hardy. Exception."

As to assignment 4. The witness Archie C. Shreve testified on direct examination:

"I heard John C. Hobbs, who was a witness for the Government, testify on the occasion when he and Mr. Perkins came to San Diego in the summer or fall of 1931, and had a conference with me and J. H. Shreve with reference to the affairs of the Security Building and Loan Association. I believe Mr. Perkins and my brother Daniel H. Shreve telephoned me and asked for J. H. Shreve or myself to come to Phoenix. I told them it was not possible for us to come here and they wanted to hold a conference with us and were attempting to borrow some funds for the Building and Loan Association. As to who was to make the loan I could not say. Mr. Perkins and Dan Shreve were the people asking for a loan on behalf of the Security Building and Loan Association or the Century Investment Trust. Mr. Perkins and Mr. Hobbs came to San Diego at their request.

"Q. And what was said or done after they arrived in San Diego? A. Mr. Perkins and Mr. Hobbs and myself, my brother J. H. Shreve——

"Mr. Flynn. We object to any conversation at this conference, on the ground that no proper foundation has been laid, and neither Mr. Hobbs nor Mr. Perkins, when they were on the stand, no impeaching questions were asked, and the further ground it is self-serving.

"The Court. Sustained.

"Mr. Hardy. Well, at this time Mr. Hobbs and Mr. Perkins came to San Diego, California, was there any discussion with respect to the business of either the Security Building and Loan Association, the Century Investment Trust or the Arizona Holding Corporation? A. There was a discussion of the business of the Security Building and Loan Association and the other companies may have been mentioned.

"Q. And what was the nature of that discussion?

"Mr. Flynn. We object to that on the ground it is immaterial, it is self-serving, and no foundation being laid for any impeaching question.

"The Court. Yes, the same question.

"Mr. Hardy. Exception.

"Q. Did you at any time, while these corporations, the Arizona Holding Corporation and the Security Building and Loan Association and the Arizona Holding Corporation were functioning, have any discussion with Mr. Perkins or Mr. Hobbs about the overhead expenses of those companies? A. I did.

"Q. Will you state please what that conversation was?

"Mr. Flynn. I object to that on the ground that no time is fixed, that it is self-serving; no foundation being laid for an impeaching question.

"The Court. Sustained.

"Mr. Hardy. Exception."

There were other efforts to introduce similar testimony by the same witness in the same manner to which like objections were interposed and the same ruling made. To set forth the details in this already too lengthy opinion would serve no purpose and would not change conclusions arrived at.

Appellants state their contention as follows: "The witnesses Hobbs and Perkins testified on behalf of the government concerning conversations with defendants Jesse H. Shreve and Archie C. Shreve. The Trial Court erroneously refused to permit defendant Archie C. Shreve to give his version of these conversations, or to permit defendants to make offer of proof in respect thereto."

It is true that Hobbs and Perkins testified that they had many conversations with these defendants. With one or two unimportant exceptions no details of these conversations were given by these witnesses on their direct examination.

The record indicates that the statements, conversations and discussions sought to be adduced from this witness, Archie C. Shreve, took place between the appellants among themselves or with their deceased brother indicted as a co-defendant. Such statements were clearly inadmissible under the hearsay rule. On the direct examination of Hobbs and Perkins the government had not gone into any of the details of such conversations. These were brought out on cross-examination so it is not correct to say that the substance of such conversations had been testified to on behalf of the government so as to make absolute appellants' right to give some contradictory version. Furthermore, it was part of the objection that, at the time Hobbs and Perkins testified in relation to these matters, no foundation for impeachment had been laid. The court correctly pointed out that if it was the purpose of appellants to impeach the government's witnesses the proper foundation would have to be laid. Appellants' attorney to obviate the exception on this ground disclaimed any purpose of impeaching the witnesses.

As to the other objection that the statements sought to be adduced were self-serving, it appears from the record that the District Court was justified in so ruling. The statement of the witness leading up to the first objection was, "It was soon after the so-called great crash in 1929 and my brother J. H. Shreve came over to Phoenix from San Diego and stated that ———." At this point the objection was interposed upon the ground that "It is self-serving conversation between the defendants in this case."

While disclaiming intention of directly contradicting the Government's witnesses, the effort to get into the testimony conversations between these appellants continued and the court correctly held them to be self-serving and inadmissible.

The proceedings of the trial as set forth in the record indicate a persistent purpose to have the witness Archie C. Shreve, by this method of narrating alleged statements made by J. H. Shreve and his deceased brother, exculpate the Shreves, and in this way have the story of J. H. Shreve put before the jury without the necessity of his going on the witness stand himself, and submitting to cross-examination.

■ Again the witness was asked if at any time, when the companies were functioning, he had had discussions with Mr. Perkins and Mr. Hobbs. It was objected that the time was not fixed, the objection was sustained, exception taken and the ruling is here assigned as error. The ruling of the court was right.

From a careful reading and consideration of the entire record in this case we are impressed that the lower court was endeavoring, as it should, to accord defendants a fair and impartial trial. A study of the rulings complained of and the colloquies incident thereto convinces us that the court made it clear that where the purpose of questions put to the witness, Archie C. Shreve, was to contradict the government witnesses this would be allowed if the proper foundation were laid and proper questions asked. Indeed, as above stated, this witness was permitted to narrate at length his version of conversations and statements had with and made by government witnesses. What the trial court would not allow as apparent from these rulings was the manifest intent to inject into the case by hearsay, self-serving declarations of one of the defendants who himself did not take the witness stand.

■ Declarations of a party in his own behalf are not admissible in evidence unless part of the res gestæ. Such declarations are said to be self-serving. Busch v. United States, 8 Cir., 52 F.2d 79, 88; Herman v. United States, 5 Cir., 48 F.2d 479, 480; Nielson et al. v. United States, 9 Cir., 24 F.2d 802, 803; Fields et al. v. United States, 4 Cir., 221 F. 242, 244. See also 16 C.J. § 1265, p. 636; Wharton's Criminal Evidence, 10th ed., vol. II, § 690, p. 1425-1426; Jones Comm. on Evidence, vol. 2, § 895, p. 1636. The reason for the rule is to prevent fraud and the fabrication of evidence.

Conceding the existence of the rule, counsel for appellants argue that the conversations or statements attempted to be brought out were opened by the Government, and, therefore, the defendants were privileged to prove the whole of such conversations or, at least, the defendants' version thereof. Cases cited by appellants do hold that self-serving declarations, if made in a conversation part of which had already been introduced in evidence by the state, are admissible.[1]

Without disagreeing with the principles of law involved in the contention of appellants, we find them inapplicable in the peculiar circumstances which confront us here. In dealing with this question we must bear in mind the cautionary words of Jones (Comm. on Evidence, vol. 3, § 1066, p. 1962): "Although it is a familiar principle that when a part of a conversation or admission is introduced, the other party may prove the rest of the statement, the rule is nevertheless limited to such statements as fairly tend to qualify or explain the part first given. Where a conversation about a given matter is introduced, the door is not thereby opened for the introduction of what was said in relation to a different matter, although in the same conversation. * * * and the rule now is that where a statement forming part of a conversation is given in evidence, whatever was said by the same person, in the same conversation, that would in any way qualify or explain that statement is also admissible; but detached and independent statements in no way connected with the statement given in evidence, are not admissible; * * *."

The record also shows that in the discussions concerning this class of testimony and the objections thereto the court indicated its conception of the proper procedure and how some of this evidence might be introduced but counsel for appellants would not be admonished and persisted in proceeding in his own way, thus inviting the rulings of which he now complains.

After the exclusion of the foregoing testimony concerning conversations the following occurred:

As to assignment 5:

"Mr. Hardy. May it please your Honor, in reference to the three questions which were asked of this witness pertaining to the conversation on December 20th, and the conversation early in the year 1930, and a conversation in February, 1930, between this defendant and the defendants J. H. Shreve and Glen O. Perkins, and J. C. Hobbs, which, upon objection by the United States Attorney, were held inadmissible, and which objection was sustained,

[1] Carver v. United States, 164 U.S. 694, 696, 697, 17 S.Ct. 228, 41 L.Ed. 602; Bogk v. Gassert, 149 U.S. 17, 25, 13 S. Ct. 738, 37 L.Ed. 631 (civil); Perrin v. United States, 9 Cir., 169 F. 17, 26; Stevenson v. United States, 5 Cir., 86 F. 106, 110, 111; Hinton v. Welch, 179 Cal. 463, 465, 466, 177 P. 282 (civil).

may we have the privilege at this time, for the purpose of the record only, of making an offer of proof in regard to those questions?

"The Court. No.

"Mr. Hardy. May we file with the Clerk of the Court a written offer?

"The Court. You can do that if you want to, but you can't get it before the jury.

"Mr. Hardy. Can we make it without the presence of the jury?

"The Court. No, you may write it out.

"Mr. Hardy. And may it be considered as a part of the evidence?

"The Court. It would not be a part of the evidence because it is not admitted.

"Mr. Hardy. As part of the record in this case?

"The Court. You can file it with the Clerk.

"Mr. Hardy. Then, may we have an exception to the refusal to be permitted to make the offer?

"The Court. Yes."

There was no error in this ruling of the court. It may not be without significance here to call attention that the dates given in the offer of proof do not correspond with the times indicated in the testimony set out in this assignment of error.

■■■■ The Court very properly refused to permit appellants' attorney to state what he proposed to prove in the presence of the jury. Nor was it necessary to excuse the jury and delay the trial to permit the offer to be dictated to the reporter. The Court granted permission to counsel to reduce the same to writing and file it with the clerk of the court. This was done, the contents of this paper were transcribed into the bill of exceptions and we fail to see in what manner this procedure violated any of appellants' rights.

■■■■ Under this same specification of error the appellants argue that witness Archie Shreve should have been permitted to testify to a conversation purportedly had between himself, Jesse Shreve and Glen O. Perkins relative to Government Exhibit 207. This exhibit was in the form of a letter addressed to one Manuel J. King, and received by him through the mails, describing in glowing terms the "advantages" of an "investment" in the Century Investment Trust and bearing the printed fac-

simile signature of J. H. Shreve, as the president thereof. It was received in evidence upon the testimony of Manuel J. King although previously Glen O. Perkins had identified the facsimile signature thereon as being a copy of that of J. H. Shreve. Upon the basis of that identification by Perkins, counsel for appellants endeavored to introduce through witness Archie Shreve declarations relative thereto, assertedly made by Jesse Shreve in the presence of Perkins.

Anything said by Jesse Shreve upon this subject would be so obviously self-serving as to be inadmissible under the familiar rule, and the court ruled correctly in refusing to permit witness Archie Shreve to testify to declarations of Jesse Shreve. Perkins mentioned no conversation, merely identifying the facsimile signature, the likeness of which no one denied. The self-serving nature of the declarations clearly appear in the offer of proof.

■■■ Although not separately specified, appellants here argue that Government Exhibit 207 (Assignment XXV) was inadmissible upon the ground of hearsay because of failure to associate the defendants with the exhibit. The letter was received through the mail by King, purporting to come from Century Investment Trust, apparently sent out through regular channels and in the regular course of business by the Century Investment Trust in connection with the payment of dividends to King. There was no contention made that Jesse Shreve had actually signed the letter.

The letter was sufficiently connected with the Century Investment Company to justify its admission in evidence. McIntyre v. United States, 6 Cir., 49 F.2d 769; Havener v. United States, 10 Cir., 49 F.2d 196, 200; Cochran v. United States, 8 Cir., 41 F.2d 193, 205; Levinson v. United States, 6 Cir., 5 F.2d 567, 569.

The next specification, based on assignments of error VIII to XII inclusive, is stated by appellants, as follows: "The indictment alleges that the defendants falsely pretended and represented that all money deposited with the Security Building and Loan Association would be invested in sound first mortgages on improved real estate carefully selected, whereas such mortgages were at all times uncollectable and practically worthless. The trial court erred in admitting in evidence exemplified copies of such mortgages, and also exem-

plified copies of deeds and assignments related thereto, without first requiring the government to account for the failure to produce the originals, or in anywise lay the foundation for admission of secondary evidence thereof."

Assignments of Error VII, IX, X, XI, and XII all relate to the admission in evidence of exemplified copies of deeds, mortgages and assignments of mortgages. The appellants argue that the originals of these documents should have been produced, or their absence accounted for, in order to justify the admission of the copies in evidence. The Government contends the exemplified copies of these documents were admissible without the necessity of accounting for the absence of the originals, and cite 28 U.S.C.A. § 688.

Assignment VIII, relating to Government Exhibit 125, will serve as a good example for discussion under this specification, and determination thereof will answer the remaining four assignments thereunder. This Exhibit 125, introduced during the testimony of witness James M. Shumway, was an exemplified copy of a deed, filed and recorded in the office of the county recorder of Maricopa County, Arizona, at the request of Arizona Title Guaranty and Trust Company, May 12, 1931, executed by Arizona Holding Corporation, by D. H. Shreve, president, and R. F. Watt, secretary, conveying a certain lot in the town of Tempé, Arizona, to James M. Shumway, with no consideration being recited. It appears from Shumway's testimony that he, in turn, mortgaged this property to Security Building & Loan Association for $11,800 (Gov't Ex. 126) and give his note to Security Building & Loan Assn. for said sum, secured by said mortgage. Shumway testified that both the note and mortgage were in blank when he signed them and that he did not know that any property had been deeded to him; that he never received any money from this transaction; that he did not pay anything to recover the note, nor was he paid anything for signing a deed conveying the property back to the Arizona Holding Corporation.

The appellants argue that the documents were not admissible under the laws of Arizona but, as the appellee relies upon the Federal statute, we do not deem necessary a discussion of the law of Arizona on the admissibility of exemplified copies of deeds, mortgages, etc., which have been recorded.

Revised Statutes, § 906, 28 U.S.C.A. § 688, reads, in part: "All records and exemplifications of books, which may be kept in any public office of any State or Territory, * * * not appertaining to a court, shall be proved or admitted in any court or office in any other State or Territory, * * by the attestation of the keeper of the said records or books, and the seal of his office annexed, if there be a seal, together with [an exemplification] * * *. And the said records and exemplifications, so authenticated, shall have such faith and credit given to them in every court and office within the United States as they have by law or usage in the courts or offices of the State, Territory, or country, as aforesaid, from which they are taken."

Myres v. United States, 5 Cir., 256 F. 779, 782, holds: "The United States courts, in criminal procedure, do not follow the practice of the state courts of the states in which they sit. Section 906, Revised Statutes of the United States (Comp.St. § 1520 [28 U.S.C.A. § 688]), authorizes the use in the federal courts of authenticated documents from state courts and offices. It provides that such certified records 'shall have such faith and credit given to them in every court and office within the United States as they have by law or usage in the courts or offices of the state, territory, or country, as aforesaid, from which they are taken.' The effect of this provision is not an adoption of the rules of practice as to the preliminaries necessary to the introduction of certified records fixed by state statutes, but to give to such certified copies, when introduced, the like faith and credit that they are accorded in the courts of the state." This case was not carried to the Supreme Court and has never been expressly overruled.

The best evidence rule means, simply, that the best evidence in the power of a party to furnish must be produced. Before substituted evidence may be used, it must be made to appear that the party is unable to produce primary evidence, either through loss, or otherwise. Secondary evidence of the contents of a writing may be introduced, ordinarily, upon a sufficient showing, to the satisfaction of the court, of the existence of the original and the fact that is unavailable to the party. But such evidence is secondary, as distinguished from primary.

[15, 16] In the absence of a statute the Government could, under the rules of evi-

dence, introduce the exemplified copies of the deeds, etc., upon laying proper foundation, and accounting for the originals. The statute obviates the necessity of proving loss of the original or otherwise accounting for it by accepting at face the exemplified copies of public records. In addition, it has been held that, under a similar statute, a copy is regarded as of the same class or grade of evidence, as primary or secondary, as the original. ·Campbell v. Lacede Gas-Light Co., 119 U.S. 445, 449, 7 S.Ct. 278, 30 L.Ed. 459.

■ No error is revealed by this assignment. R.S. § 906, 28 U.S.C.A. § 688; Myres v. United States, supra; Longsdorf, Cyc. Fed. Proc., vol. 2, § 586, p. 867; id. vol. 5, § 2259, p. 652; Bank of the United States v. Benning, Cir.Ct.D.C., 2 Fed.Cas. 686, No. 908; Peltz v. Clarke, Cir.Ct.D.C., 19 Fed.Cas. 130, No. 10,914, affirmed 30 U.S. 481, 5 Pet. 481, 8 L.Ed. 199.

■ The sixth specification of error is as follows: "The Government's witness Watt testified he rewrote the books of Century Investment Trust and Arizona Holding Corporation at the direction of the deceased defendant, Daniel H. Shreve, from records not made by him, and from information obtained by him from whatever sources available. He also testified many entries in these books are reflected into the books of Security Building and Loan Association. The trial court erred in admitting these books in evidence, since they were not original entries of the transactions there recorded, are not the best evidence, and are hearsay."

Before discussing this point, the above statement must be corrected. Watt testified he rewrote the books of the Century Investment Trust, and, in addition said: "I did not rewrite any books of the Security Building and Loan Association ˙ * * *. I did not rewrite any books of the Arizona Holding Corporation." He stated that he rewrote the books of the Century Investment Trust at the direction of the late defendant Daniel H. Shreve, as to whom the indictment was abated, using bank deposit slips, check stubs, cancelled checks, and what information Daniel H. Shreve gave him.

On the first appeal we said: "As to the books of the corporations named in the indictment which corporations it is alleged were mere instrumentalities of the defendants for the perpetration of the fraudulent scheme, it is clear that these books were admissible without other proof ·than the connection of the defendants with the organization and control of these corporations." 77 F.2d 2, 7, 8. This ruling is decisive of the question. See Wilkes v. United States, 9 Cir., 80 F.2d 285, 290.

Having decided that the court below committed no error in admitting the exhibits in evidence referred to in the specification immediately above, the next specification automatically falls, because it is predicated upon the theory that the exhibits were inadmissible. The appellants contended that the exhibits being inadmissible, Government witness Fierstone was not privileged to testify relative thereto and that error was committed in the receipt of his testimony thereto. The exhibits were admissible and, therefore, the assignment must fall. 77 F.2d 2, 7, 8.

■ The eighth specification of error is directed to the admission in evidence of certain records of the First National Bank of Prescott, Arizona, which was not named in the indictment, or the bill of particulars. The appellants contend these exhibits are secondary evidence, violative of the best evidence rule, and are hearsay.

Assignment XIII, which covers this specification, charges error in the admission in evidence of Government Exhibit 84, which was a transcription of the general ledger of the First National Bank of Prescott, Arizona, listing items under the heading of "Resources" and "Liabilities," for Friday, Nov. 8, 1929, and introduced during the testimony of witness William V. Trott, who was employed at that time in the said bank. No reason was given for the introduction of this exhibit; there is no reference therein to anyone or any corporation named in the indictment; neither was it connected up in any way with the defendants.

Even if we assume, without conceding, the exhibit to be erroneously admitted, we are of opinion that it is wholly innocuous.

■ Assignment XIV charged error in the admission in evidence of Government Exhibit 90, item 4, in a letter addressed to the First National Bank of Phoenix, Arizona, from the First National Bank of Prescott, dated March 8, 1929. The item read: "March 7, 1929, No. 38, Maker Arizona Holding Corporation, payor, 91-11, amount $20,000; last endorser Us." This exhibit was introduced during the testi-

810

mony of W. C. Evans, named a defendant in the indictment, and as to whom the indictment was dismissed at the beginning of the second trial. Evans was cashier and a director of the First National Bank of Prescott. This appears harmless also, and, without expressing an opinion as to its admissibility, its reception in evidence was non-prejudicial. It was not connected to any other evidence and no point was made of the fact recited.

Assignment XV charges error in admitting in evidence parts of Government Exhibits 92, 93, and 94, which were "liability ledger cards" containing description of certain notes payable to the First National Bank of Prescott, introduced during the testimony of witness Evans. Each card recited a note for $10,000, made by Joseph E. Shreve, Glen O. Perkins and J. G. Cash, respectively, and each was endorsed by Jesse H. Shreve. Evans testified that all the entries on the "first" half of each card were made by him; that the entries are correct records of the transactions they purport to record. He was cross-examined on this point, and said the entries were not the first permanent entries of the transactions, but secondary records. Continuing, on direct examination, Evans said the entries were one of the steps in the complete recording of the transaction on the books of the bank. Standing alone, there is no apparent harm in any of these three exhibits, but, as appellants' counsel point out, the notes were paid by drafts of the Security Building & Loan Association. The notes were not introduced in evidence.

Under our ruling in Greenbaum v. United States, 9 Cir., 98 F.2d 574, 578, the admission of these exhibits in evidence could not be predicated upon the Act of June 20, 1936, 28 U.S.C.A. § 695, for that act, by its very terms, is not retroactive, and the indictment herein was returned, Dec. 22, 1933, before the effective date of the act. The admissibility of the exhibits must be based upon the law as it existed prior to the enactment of the statute.

The leading case, for many years, on the subject of admissibility of entries in books made by private parties in the course of their business, is Chaffee & Co. v. United States, 18 Wall. 516, 85 U.S. 516, 21 L.Ed. 908. In that case, books of third parties were admitted in evidence against the defendants in an action by the United States to recover certain taxes on

distilled spirits, together with penalties thereon. The jury found for the plaintiff and defendants appealed. The Supreme Court said, at pages 540, 541 of 85 U.S.:

"The books were not public records; they stood on the same footing with the books of the trader or merchant. * * * Their admissibility must, therefore, be determined by the rule which governs the admissibility of entries made by private parties in the ordinary course of their business.

"And that rule, with some exceptions not including the present case, requires, for the admissibility of the entries, not merely that they shall be contemporaneous with the facts to which they relate, but shall be made by parties having personal knowledge of the facts, and be corroborated by their testimony, if living and accessible, or by proof of their handwriting, if dead, or insane, or beyond the reach of the process or commission of the court. * * *"

The court held the books improperly admitted because the entries were made by persons who had no personal knowledge of the matters stated.

Citing the Chaffee case, this court said, in Wilkes v. United States, 9 Cir., 80 F.2d 285, 290:

"The general rule is that, before the books of a corporation can be received in evidence against a defendant other than the corporation itself, the entries therein must be shown to have been made by persons having knowledge of the facts, and must be corroborated by their testimony, if living and accessible, or by proof of their handwriting, if dead, insane, or beyond the reach of process. [Cases cited.]

"The rule was not complied with in this case. It was not shown that the persons who made the entries here in question had any knowledge of the fact to which they related. Many of the entries were not proved or corroborated by the testimony of the persons who made them. No reason was shown for not calling these entrants as witnesses. Those who were called testified merely to the making of certain entries. They did not pretend to have any knowledge of the transactions referred to. The showing made was, under the general rule, clearly insufficient."

It was believed, in an earlier age, that books of third parties were not admissible in evidence upon the ground of res inter alios acta, but there is a broader view now

taken and the rule is somewhat relaxed, so that presently such books may be received in evidence subject to the limitations set forth in the Wilkes case, supra.

■ Here the requirements of the Wilkes and Chaffee cases were met in the introduction of the evidence—Evans testified that he made the entries and had knowledge of the matters therein set forth. These exhibits went merely to prove that certain personal notes had been executed; no attempt was made to prove knowledge in the defendants of the matters set out in the entries or that the entries did not accurately reflect the facts, or that defendants exercised control over the making of the entries, but simply that the facts existed, which were not denied.

It is true that in our former opinion (77 F.2d 2, 7), we said: "The record contains many other assignments of error relating to the admissibility of books of corporations other than those named in the indictment. With reference to these rulings it will be sufficient to say that in order to make them competent as against the defendants it is essential to show that the defendants made such entries or caused them to be made or assented thereto." It is sufficient answer to appellants' present contention to say that appellants on the first appeal did not contend the rule to be so strict and we intended what we said to have application to the facts there presented.

■ The appellants urge, for their ninth specification of error, that the trial court erred in admitting testimony of Government witness Schroeder based upon his audit of books and records of Century Investment Trust, Arizona Holding Corporation, and Security Building & Loan Association. The appellants claim that Schroeder, in making an audit of the books of the corporations named in the indictment, also investigated books and records of corporations not named therein, and that because the witness' audit was not based *entirely* upon the books of corporations named in the indictment and before the court, it was not admissible in evidence.

Schroeder very definitely said, on direct examination: "The audit I made and which I will testify in regard to is made on the books now in evidence in this case, and based on those alone." On cross-examination he said: "My testimony in so far as the questions asked by the United States Attorney have been solely confined to the records in evidence." And, on re-direct, he testified: "In so far as matters that I testified to on direct examination was based upon my audit which I made, and that audit was made solely from books and records in evidence in this case."

Thus, it is clear, no merit lies in this proposition advanced by appellants. That the witness may have looked at, read, studied or examined other materials will not make inadmissible testimony based solely upon books and records in evidence.

■ Drawn next to our attention is the contention of appellants that the trial court erred in admitting in evidence an original mortgage executed April 16, 1930, by one Wm. H. Perry, mortgaging to Yavapai County Savings Bank certain real estate situate in Yavapai County, Arizona, to secure payment of a promissory note of even date, in the sum of $2,500. Also claimed to be error under this specification was the admission in evidence of Government Exhibit 172, which was a Sheriff's deed, dated May 3, 1933, executed by the Sheriff of Yavapai County, Arizona, conveying to Yavapai County Savings Bank the property described in the mortgage, Government Exhibit 170, referred to immediately above. The Sheriff's deed recited a consideration of $2,750.

These exhibits were introduced in evidence upon the testimony of witness D. W. Russell, who was secretary-treasurer of the Yavapai County Savings Bank at the time of the transactions reflected by the above two exhibits. Russell testified that he was managing the bank at the time; that he made the appraisal of the property in 1930; that it was worth about $6,000 at that time; that foreclosure proceedings were had in the fall of 1932; and Exhibit 172 was the sheriff's deed marking the conclusion of the foreclosure proceedings. He also testified that the property described in Exhibit 170 was the same property described in Government Exhibit 145. This latter exhibit was an exemplified copy of a warranty deed executed by Arizona Holding Corporation by A. C. Shreve, Vice-president, and Glen O. Perkins, Asst. Secretary, to A. E. Rayburn, dated July 21, 1930, reciting a consideration of $10.00. It appeared from Government Exhibit 144, an exemplified copy of a warranty deed, that one Dean B. Blackburn, a widow, had conveyed this identical property to the Arizona Holding Company on June 26, 1930, for a recited consideration of $10.

812

The appellants argue that the Perry mortgage was hearsay because Perry was not called to testify and that no proof was offered to show Perry owned the property or that Blackburn did not. They urge that the sheriff's deed was not admissible because the preliminary foreclosure proceedings were not proven.

We are not impressed by either argument; we perceive no error in the rulings of the trial court; and are not persuaded by appellants' authorities.

■ For their eleventh specification of error, the appellants insist that: "The trial court erred in admitting testimony of Government's witness York concerning communications between the witness and his daughter relating to transactions on behalf of one of the corporations named in the indictment, because the testimony was hearsay." York, who was the father of the wife of Glen O. Perkins, died in the interval between trials of this case, and his testimony was read into the record by the reporter, from his notes of the prior trial.

The testimony was to the effect that he had executed a mortgage to the Security Building & Loan Association on certain property in Navajo County, Arizona, in December, 1930; that he had received a letter from his daughter which stated that the company with which her husband was connected had a proposition for him and wanted him to go to Arizona to take charge of a ranch in the vicinity of Holbrook. An exemplified copy of the mortgage was introduced in evidence, dated December 4, 1930, in the sum of $11,500, with A. W. York and Fannie York, his wife, as mortgagors, and Security Building & Loan Association as mortgagee. York had testified that he received no money on that mortgage, and at the same time signed a deed to the described property conveying the same to Arizona Holding Corporation, for a recited consideration of $10.

The appellants contend the testimony of York was hearsay as to the defendants, and, therefore, inadmissible, but, in view of the production of the exemplified copy of the mortgage, and of the deed, the connection between the letter of the daughter and two of the companies named in the indictment was established and testimony relative thereto was admissible.

■ Twelfth, the appellants specify as error the refusal of the trial court to permit defendant's witness, Crane, a certified public accountant, to testify that certain bookkeeping practices pursued by corporations named in the indictment "were in accord with accepted accounting principles." Crane was asked by defendants' counsel: "Is it in accordance with the accepted accounting principles for a holding company to absorb a charge to the cost of this investment in a subsidiary corporate company, proportions of the expense of operation of a subsidiary?" Objection to this question was sustained.

To permit the witness to answer the question would have invaded the province of the jury. Witness Fierstone testified that the expenses were absorbed by the holding company; whether this practice was correct in theory or not is immaterial; the question for the jury was the intent with which the entries were made, or the costs absorbed, and the knowledge of defendants of the operating losses in the subsidiary. Furthermore, to permit an answer to such a general question, knowing full well what the answer would be, would be tantamount to allowing the witness to tell the jury they were not to attach any significance to, or draw any inference from these absorption of expense entries.

The trial court fully and fairly instructed the jury in all essential matters. The appellants raise but two questions on the instructions: (1) The court failed to define to the jury the term "affirmative act," as applied to withdrawal; and (2) the court failed to instruct the jury, as requested, that there had been no evidence introduced tending to show defendants made representations that Security Building & Loan Association had a paid-in capital stock of $300,000, as alleged in the indictment.

■ On the first, we would not insult the intelligence of the jury by holding the court must define all words of more than one syllable. "Affirmative act" is a term having no hidden or technical meanings and as used was to be understood by the ordinary man. Counsel for appellants have not pointed out to us in the brief any request for, or definition of the term, and search of the instructions requested and refused does not reveal that any request was made to the trial court for a specific definition.

■ On the second, the court instructed the jury that the indictment was not evidence; that "To no extent whatever, does any averment in the indictment suggest the

fact of which it speaks,"; and that the Government is not required to make proof of every allegation of the scheme contained in the indictment. The instructions were sufficient; the court is not required to instruct the jury to disregard every allegation of the indictment upon which no proof is presented. It is sufficient if the jury be instructed as they were here.

The fourteenth, and last, specification relates to the sufficiency of the evidence. However puzzling may have proven some of the problems presented in the preceding pages, this particular argument precipitates no mystery. The record overflows with proof of appellants' guilt.

It was not necessary for the Government to prove that defendants *personally* wrote the letters, or mailed them, or even knew of each individual and minute act. There was ample evidence, if the jury chose to believe it, as the verdicts indicate, that Jesse Shreve was the active head of the organization; that Archie Shreve was actively engaged in the furtherance of the scheme; that both knew the actual condition of the business; that they employed the help and directed the policies; that the indictment letters were mailed in the regular course of the business.

There was no prejudicial error in the conduct of the trial of this case, and from an examination and study of the entire record, we are of opinion that the judgments of the court below must be

Affirmed.