## CARVER *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 588. Submitted December 15, 1896. — Decided January 4, 1897.

In a trial for murder, if the declarations of the deceased are offered, the fact that she had received extreme unction has a tendency to show that she must have known that she was in *articulo mortis,* and it is no error to admit evidence of it.

Where the whole or a part of a conversation has been put in evidence by the government on the trial of a person accused of the commission of crime, the other party is entitled to explain, vary or contradict it.

When the dying declarations of the deceased are admitted on the trial of a person accused of the crime of murder, statements made by the deceased in apparent contradiction to those declarations are admissible.

THIS was a writ of error to review the conviction of the plaintiff in error for the murder of one Anna Maledon at Muskogee, in the Creek Nation of the Indian Territory. The conviction was a second one for the same offence, the first having been set aside by this court upon the ground that improper evidence had been received of an alleged dying declaration. 160 U. S. 553.

The evidence tended to show that Carver, a man about twenty-five years of age, was grossly intemperate in his habits, and upon the day the homicide took place had been drinking a mixture of hard cider and Jamaica ginger, and was so intoxicated that he could hardly walk; that deceased, who had been his mistress for several years, had agreed to meet him in the evening at a certain mill crossing in Muskogee. They met at about half-past eight, when he soon began to threaten her that he would, before daylight, kill her and one Walker, of

whom he appeared to have been jealous. He was armed with a revolver and his conduct indicated that he was crazed with liquor. During his walk with the deceased, he met a man whom he drove off at the point of his pistol, and amused himself by firing it off at a lot of cattle, which were within range. Meeting one Crittenden, the deceased, believing that Carver was unfit to care for her and accompany her, asked Crittenden, with whom she was acquainted, to take her home. Crittenden started with them, when Carver got out his pistol again, flourished it about and fired it off twice, once in the air and once in the ground. After walking some fifty yards or more Carver again took out his pistol, flourished it around, and, either intentionally or accidentally, shot deceased in the back and mortally wounded her.

*Mr. William M. Cravens* and *Mr. J. Warren Reed* for plaintiff in error.

*Mr. Assistant Attorney General Dickinson* for defendants in error.

Mr. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

1. Defendant's fourth and fifth assignments of error were taken to the action of the court in permitting the district attorney to prove that a Catholic priest was summoned for Anna Maledon; "that she took the sacrament after she was shot," and that he "performed the last rites of the Catholic church in her behalf." We see no objection to this testimony, and think it was within the discretion of the court to admit it. *Alexander* v. *United States*, 138 U. S. 353, 357. Dying declarations are an exception to the general rule that only sworn testimony can be received, the fear of impending death being assumed to be as powerful an incentive to truth as the obligation of an oath. The fact that the deceased had received extreme unction had some tendency to show that she must have known that she was in *articulo mortis*, and if the

jury were of opinion that the fact that she received it lent an additional sanctity to her statement, it was no error to admit evidence of it. If not, it could do the defendant no harm. It was one of the facts, showing the circumstances under which the 'declaration was made, that the government was entitled to lay before the jury. In *Regina* v. *Howell*, 1 Den. C. C. 1, the deceased had received a gunshot wound, and repeatedly expressed his conviction that he was mortally wounded. Evidence that he was a Roman Catholic, and that an offer was made to fetch a priest, which he declined, appears to have been received without objection, as tending to show that he did not think his end was approaching; but his declaration was held to have been properly received. In *Minton's case*, cited by counsel in *Howell's case*, the fact of a person having received extreme unction was considered evidence that she thought herself in a dying state.

2. The sixth assignment of error was taken to the refusal of the court to permit the defendant to prove by Mary Belstead and Mary Murray the declarations of defendant, and what he said to deceased, and what she said to him, at the place of the fatal shot, immediately after the shot was fired, for the reason that the same was part of the *res gestœ*, and was also a part of the conversation given in evidence by the government witnesses. We fail to understand the theory upon which this testimony was excluded. Hays and Brann, two witnesses for the government, had testified that they had heard the shots fired and the scream of a woman; that Brann started for the place, and met defendant running away; that defendant went back toward the woman, and then returned again, when Brann caught him and took him back to the woman, about thirty yards. About this time Hays came up, and both testified as to the conversation or exclamations that were made, between deceased and the defendant. Defendant's two witnesses, Belstead and Murray, appear to have come up about the same time, and whether the conversation that took place between defendant and deceased at that time was part of the *res gestœ* or not, it is evident that it was practically the same conversation to which the government's witnesses had testified. If it were compe-

tent for one party to prove this conversation, it was equally competent for the other party to prove their version of it. It may not have differed essentially from the government's version, and, it may be, that defendant was not prejudiced by the conversation as actually proved, but where the whole or a part of a conversation has been put in evidence by one party, the other party is entitled to explain, vary or contradict it.

3. There was also error in refusing to permit the defendant to prove by certain witnesses that the deceased, Anna Maledon, made statements to them in apparent contradiction to her dying declaration, and tending to show that defendant did not shoot her intentionally. Whether these statements were admissible as dying declarations or not is immaterial, since we think they were admissible as tending to impeach the declaration of the deceased, which had already been admitted. A dying declaration by no means imports absolute verity. The history of criminal trials is replete with instances where witnesses, even in the agonies of death, have through malice, misapprehension or weakness of mind made declarations that were inconsistent with the actual facts; and it would be a great hardship to the defendant, who is deprived of the benefit of a cross-examination, to hold that he could not explain them. Dying declarations are a marked exception to the general rule that hearsay testimony is not admissible, and are received from the necessities of the case and to prevent an entire failure of justice, as it frequently happens that no other witnesses to the homicide are present. They may, however, be inadmissible by reason of the extreme youth of the declarant, *Rex* v. *Pike*, 3 C. & P. 598, or by reason of any other fact which would make him incompetent as an ordinary witness. They are only received when the court is satisfied that the witness was fully aware of the fact that his recovery was impossible, and in this particular the requirement of the law is very stringent. They may be contradicted in the same manner as other testimony, and may be discredited by proof that the character of the deceased was bad, or that he did not believe in a future state of rewards or punishment. *State* v. *Elliott*, 45 Iowa, 486; *Commonwealth* v. *Cooper*, 5 Allen, 495; *Goodall* v. *State*, 1 Oregon,

333 ; *Tracy* v. *People*, 97 Illinois, 101 ; *Hill* v. *State*, 64 Mississippi, 431.

It is true, that in respect to other witnesses, a foundation must-be laid for evidence of contradictory statements by asking the witness whether he has made such statements, and we have held that where the testimony of a deceased witness, given upon a former trial, was put in evidence, that proof of the death of such witness, subsequent to his former examination, will not dispense with this necessity. *Mattox* v. *United States*, 156 U. S. 237. That case, however, was put upon the ground that the witness had once been examined and cross-examined upon a former trial. We are not inclined to extend it to the case of a dying declaration, where the defendant has no opportunity by cross-examination to show that by reason of mental or physical weakness, or actual hostility felt toward him, the deceased may have been mistaken. Considering the friendly relations which had existed between the defendant and the deceased for a number of years, their apparent attachment for each other, and the alcoholic frenzy under which defendant was apparently laboring at the time, the shooting may possibly not have been with deliberate intent to take the life of the deceased, notwithstanding the threats made by the defendant earlier in the evening. In nearly all the cases in which the question has arisen evidence of other statements by the deceased inconsistent with his dying declarations has been received. *People* v. *Lawrence*, 21 California, 368 (an opinion by Chief Justice Field, now of this court); *State* v. *Blackburn*, 80 N. C. 474; *McPherson* v. *State*, 9 Yerg. 279; *Hurd* v. *People*, 25 Michigan, 405; *Battle* v. *State*, 74 Georgia, 101; *Felder* v. *State*, 23 Tex. App. 477; *Moore* v. *State*, 12 Alabama, 764.

Our attention has been called to but one case to the contrary, viz., *Wroe* v. *State*, 20 Ohio St. 460, cited with apparent approval in the *Mattox case*. But we think, as applied to dying declarations, it is contrary to the weight of authority.

As these declarations are necessarily *ex parte*, we think the defendant is entitled to the benefit of any advantage he may have lost by the want of an opportunity for cross-examination. *Rex* v. *Ashton*, 2 Lewin C. C. 147.

The disposition we have made of these assignments renders it unnecessary to consider the others. The judgment of the court must be

*Reversed, the conviction set aside, and a new trial ordered.*

MR. JUSTICE BREWER and MR. JUSTICE PECKHAM concurred in reversing upon the sixth assignment only.