110 N.J. Super. 264 (1970)
265 A.2d 387
JULIO CESTERO, INDIVIDUALLY AND PER QUOD, PLAINTIFF-APPELLANT (ON COUNTERCLAIM), AND CELIA CESTERO, ETC., ET AL., PLAINTIFFS,
v.
JENNIE FERRARA, DEFENDANT - COUNTERCLAIMANT - RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 20, 1970.
Decided April 29, 1970.
*267 Before Judges GOLDMANN, LEWIS and MATTHEWS.
Mr. Vincent D. Enright, Jr., argued the cause for appellant (Messrs. Harth & Enright, attorneys).
Mr. Adrian I. Karp argued the cause for respondent (Messrs. Van Riper, Belmont & Villanueva, attorneys).
The opinion of the court was delivered by GOLDMANN, P.J.A.D.
Plaintiff Julio Cestero appeals from a Law Division judgment entered upon a jury verdict in favor of defendant-counterclaimant Jennie Ferrara for $60,000. The jury also returned a verdict of no cause of action on the complaint brought by Julio Cestero, his wife Celia, their two infant children Ivan and Wandi, and Carlos Cestero, owner of the car in which they had been riding, seeking recovery for personal injuries and property damage. No appeal was taken from the judgment embodying that verdict.
The actions arose out of a collision between the station wagon driven by Julio Cestero and the car operated by Jennie Ferrara, at the intersection of Route 46 and Clinton *268 Road in Fairfield Township, Essex County. Cestero's wife and two children were passengers in the front seat. Cestero testified that he was traveling in the westbound slow lane at about 45 m.p.h. as he approached the intersection. The weather was clear, the roads dry and traffic moderate. The intersection was controlled by traffic lights and the speed limit for Route 46 was 50 m.p.h. Cestero said that the traffic light was green for him from a distance of 100 to 200 yards from the intersection up until the time of impact. This version of the accident was corroborated by Mrs. Cestero and an independent eyewitness, one Calderone, whose deposition was read into evidence because he was out of the State and unavailable at the time of trial.
Mrs. Ferrara had been traveling north on Clinton Road. Her testimony was that she stopped at a red traffic signal controlling the intersection and when the light turned green in her favor she proceeded into the intersection after first observing that cars in both eastbound lanes and the westbound fast lane on Route 46 had stopped for the red light. She admitted that she never saw the Cestero vehicle before the impact, which occurred after she had crossed the eastbound lanes and the westbound fast lane on Route 46. The photographs admitted in evidence show that the Cestero vehicle ran into the side of the Ferrara car with considerable impact.
Defendant produced Mae Pezdic who testified that she had been traveling east on Route 46 and intended to exit therefrom by entering Clinton Road via a jughandle and then proceed across Route 46. She said that when she came off Route 46 into the jughandle she heard a crash and noticed that the traffic light controlling the intersection ahead of her, and through which the Ferrara vehicle had already passed, was definitely green for Clinton Road. However, it changed to red just as she reached Route 46.
Mrs. Ferrara's first recollection of the events following the collision was during emergency treatment at the Mountainside Hospital where she had been taken by ambulance. *269 She had sustained a comminuted fracture of the right femur and multiple contusions and lacerations. Dr. Greene, who performed an open reduction and set the fracture with a plate and nails, said that there was a question of brain concussion at the time. Following the operation Mrs. Ferrara was placed in a spica cast extending from the upper abdomen to below the ankle. The cast was removed some 3 1/2 months later, but during that period Mrs. Ferrara was readmitted to the hospital by ambulance on three occasions for additional treatment. Following removal of the cast she used crutches, and shortly thereafter went to one crutch and then to a cane. Dr. Greene testified that the injured leg was longer than the other, causing Mrs. Ferrara to limp. He said that she would limp and be plagued with continuing pain the rest of her life. The persistent pain was to a considerable degree caused by the position of the plate and pins, and this might require another operation to remove them. Another permanent residual of defendant's injuries was a scar running a considerable length along the outer aspect of the right thigh, and this scar was shown to the jury.
The Cesteros produced Dr. Dilger, who had examined Mrs. Ferrara for trial purposes but had never viewed her x-rays or medical records. His conclusions as to the nature of her injuries and her condition was reached 18 months after the accident on the basis of a single examination. He testified that the alignment of the injured leg was very good, both legs were of equal length, there was no muscle atrophy, and there was a slight limitation of internal rotation of the hip. Counsel for the Cesteros had Mrs. Ferrara walk the length of the courtroom in the presence of the jury so that Dr. Dilger could observe the degree of her limp, although this had been done for the doctor's benefit during an earlier court recess. Following the court demonstration the doctor said he had noticed that Mrs. Ferrara walked "holding the leg quite stiff, which is not normal"  in other words, her limp appeared to be exaggerated.
*270 Mrs. Ferrara's special damages to the date of trial totalled $4,500, an uncontested figure. Her age at the time was 37, and her life expectancy was given as 38.46 years. As the court noted in the course of the argument on plaintiffs' motion for a new trial, Mrs. Ferrara looked at least 20 years older. A former licensed beautician, she had planned to open her own beauty salon. She testified she would not be able to open her own place because she could not stand for any length of time.
A day after Mrs. Ferrara had testified counsel for Carlos Cestero moved for a mistrial, claiming that while Mrs. Ferrara was on the stand testifying on direct examination about her limp and how people commented upon it juror No. 6 was crying. (As to this, more later.) Asked by the trial judge to explain how the juror was crying, co-counsel said that "both eyes were red and there were tears in her eyes. She bowed her head down and covered her eyes with both hands." In denying the motion the judge said that he did not think the juror was emotionally involved; he did not observe the condition co-counsel described, nor had the court clerk, who faced the juror, or defense counsel. It is to be noted that neither the attorney who claimed to have witnessed the juror's reaction nor his co-counsel had objected at the time when the observation was made. As it turned out, juror No. 6 was not one of the 12 jurors chosen to decide the case.
The record also shows that before the return of the verdict counsel representing Mr. and Mrs. Cestero and their children stated, out of the presence of the jury, his conviction that Mrs. Ferrara would prevail and the claim of the Cesteros would be rejected by the jury. After stressing the seriousness of defendant's injuries, her high pecuniary damages, and the other proofs concerning the liability of the parties, he called upon his co-counsel, representing Carlos Cestero, to settle the case within policy limits because he believed the verdict would exceed those limits. As an inducement, he offered to withdraw the Cesteros' claims against Mrs. Ferrara. Following a recess, *271 during which co-counsel got in touch with the insurance company, he announced that the company felt that it had a defensible case but authorized him to offer Mrs. Ferrara $10,000. The offer was conveyed to her by her attorney and she rejected it as entirely inadequate.
Sometime after the jury verdict of $60,000 on the Ferrara counterclaim and no cause of action on behalf of the four plaintiffs, by a vote of 11-1, counsel for Julio Cestero moved for a new trial on the counterclaim, alleging that the verdict was against the weight of the evidence and the result of mistake, passion, partiality or prejudice. When the matter of juror No. 6 crying came up, the trial judge broke in and said
Let's get this straight. The only thing that was seen was a tear, not crying. She didn't break down and sob * * *.
Nobody in the courtroom noticed it except [plaintiffs' attorney] and one other attendant * * *. On further observation, myself, this woman may have had a congenital condition because it seemed to me her eyes were always red. * * * but she was not selected as one of the 12 jurors.
On the question of liability, the judge had this to say:
* * * It seems to me that there was no evidence that I could see that the jury could not properly find [for] Mrs. Ferrara.
This was a question of who had the green light on a dangerous intersection on Route 46.
And as to damages, he observed, as already noted, that Mrs. Ferrara looked 58 and had a severe limp that was to stay with her the rest of her life.
Appellant Cestero asserts that there was a manifest denial of justice in the trial judge's denial of his motion for a new trial, in light of the fact that Mrs. Ferrara "displayed emotion while on the witness stand, thereby causing a juror to weep." He recognizes that, generally speaking, whether "misconduct" in the form of a display of emotion by a party while on the witness stand is ground for a new trial lies within the sound discretion of the trial judge, and his ruling will not be reversed unless that discretion is abused. Annotation, 69 *272 A.L.R.2d 954, 956 et seq. (1960); and see Dolid v. Leather-kraft Corp., 39 N.J. Super. 194, 197-198 (App. Div. 1956); Schuttler v. Reinhardt, 17 N.J. Super. 480, 484, 486 (App. Div. 1952). However, he argues that a new trial should have been granted because defendant's "misconduct," even if involuntary, clearly had a prejudicial effect on at least one juror at the moment  an "improper influence" described as so strong that the juror was unable to control her emotions. Further, the fact that the juror was not one of the 12 chosen to deliberate and participate in the verdict would not alter the force of the argument because, having sat through all three days of the trial (and for 1 1/2 days after the incident in question), it is a reasonable inference that she had the opportunity of improperly influencing the remaining jurors.
The argument has the barest surface appeal and we reject it. First, neither of the two attorneys opposing the defense and counterclaim had commented at the time upon the alleged effect that Mrs. Ferrara's emotional reaction while on the witness stand might have had on juror No. 6. They remained silent. It was the judge, and not counsel, who in the course of a settlement conference following Mrs. Ferrara's appearance on the witness stand, mentioned that a court attendant had noticed a tear in the juror's eyes. And, as we have observed above, when the motion for a mistrial was made the next day, the judge said that neither he, nor the court clerk or defense counsel had observed the juror's reaction. We have already quoted from what the judge said about the matter at the hearing on the motion for a new trial. We find no "misconduct" (to use plaintiff's pejorative) on the part of Mrs. Ferrara. She may have been emotionally moved when questioned about her limp, but the statement in plaintiff's brief that she "broke down and began crying" is not substantiated by the record. We find no evidence of a prejudicial effect upon the jury, particularly in view of the fact that juror No. 6 was not one of the 12 chosen to decide the case.
It is also argued that it was manifestly unjust for the trial judge to deny the new trial motion because he had made remarks *273 in the presence of the jury which had the potential of prejudicing it in favor of defendant. What plaintiff complains of is the judge's remark that there were no inconsistencies between defendant's testimony and her witness Pezdic's testimony, as compared with their respective statements made on deposition, and that these alleged inconsistencies pertain to crucial matters which should have been left for the jury's ultimate determination. In Mrs. Ferrara's case, the matter involved was how many lines of traffic in the eastbound and westbound lanes were stopped when she proceeded into the intersection on the green light; and in Mrs. Pezdic's case the reference is as to just when she saw the traffic signal change with relation to when she heard the crash.
There can be no disagreement with plaintiff's argument that the judge must conduct the trial in a fair and impartial manner, without making remarks that might prejudice a party or which are calculated to influence the minds of the jury. Each case must be judged on its own particular facts, and unless the remarks tend to prejudice the complaining party, the verdict will not be disturbed. Comparing the alleged inconsistent trial testimony with what was said on deposition, we conclude that there was no real contradiction in the testimony, and the judge correctly so found. It has long been held that a trial judge may comment on the evidence, and it is frequently his duty to do so, provided it is to assist and not control the jury's findings. The control of examination, both direct and cross, resides in him, to the end that the proofs may be kept within reasonable bounds. His discretion in this respect is a broad one, and we will not interfere with its exercise absent a clear abuse of that discretion. Borowicz v. Hood. 87 N.J. Super. 418, 423 (App. Div. 1965), certif. den. 45 N.J. 298 (1965); Polulich v. J.G. Schmidt Tool, Die & Stamping Co., 46 N.J. Super. 135, 143-145 (Cty. Ct. 1957); Vargo v. P. Ballantine & Sons, 119 N.J.L. 561, 565 (E. & A. 1938).
This court dealt with a similar situation in Mitilenes v. Snead, 45 N.J. Super. 246, 250-252 (1957), where plaintiff *274 contended that the trial judge had improperly refused to permit a witness to be cross-examined as to testimony given in a previous criminal proceeding arising out of the same accident, the contention being that it was inconsistent with his trial testimony. The trial judge said that he did not see a "sufficient clarity in contradiction to allow it." We found no error, particularly in view of the fact that counsel, as here, attempted to establish a contradiction by taking a single question out of context. The rulings of the trial judge in the present case were equally well founded and we find no error.
Defendant next argues that it was reversible error for the trial judge to admit into evidence that portion of the hospital record which, it is said, recited defendant's version of the details of the accident. The part of the hospital record which was objected to was contained in the admission sheet:
Pt. stopped for red light, started up on green light and got bit. Believes she was unconscious but has no gross loss of memory other than this.
This was followed by "Complaining of pain in rt thigh, rt shoulder and head."
Evidence Rule 63 (13), which deals with the business entry exception to the hearsay rule, provides:
A writing offered as a memorandum or record of acts, conditions or events is admissible to prove the facts stated therein if the writing or the record upon which it is based was made in the regular course of a business, at or about the time of the act, condition or event recorded, and if the sources of information from which it was made and the method and circumstances of its preparation were such as to justify its admission.
Declarations of an injured person as to his condition, symptoms and feelings, made to a physician for the purpose of diagnosis and treatment, are admissible in evidence. However, statements as to the cause of the symptoms or conditions are generally held to be inadmissible. Pinter v. Parsekian, 92 N.J. Super. 392, 394 (App. Div. 1966). In that *275 case plaintiffs' sole medical witness was permitted to testify over objection that his patient had given him a history which recited exactly how the accident had happened. This was held to be reversible error. And so in State v. Gardner, 51 N.J. 444 (1968), where defendant was charged with murder and the crucial question was whether he had participated in an unjustified attack upon the victim which resulted in his death. The hospital record contained phrases which stated that decedent was "struck from behind by a `2 x 4'," "beaten up with a wooden club," "had apparently been beaten tonight with a wooden club." Other statements of similar import were contained in attached letters. The court held that these statements were not medical facts in that they contained information as to the cause of the injuries which came from a source other than the physician's examinations and, as such, should not have been brought to the attention of the jury.
Dr. Greene testified that when he first saw Mrs. Ferrara in the emergency room of the hospital where she had been brought following the accident, there was some question in his mind of a brain concussion. Since there was every indication that she required immediate surgical intervention because of her severe comminuted fracture of the right femur, it was important that he determine just how serious her head injury might be. Her ability to recall what happened was therefore important to his diagnosis and his determination as to whether to proceed to operate.
Evidence Rule 63(12) declares that a statement is admissible "if it was made in good faith and it * * * (c) described to a physician consulted for purposes of treatment the inception, general character of the cause or external source of symptoms, pain or physical sensation where such a description was relevant to diagnosis and treatment." And see the Report of the New Jersey Supreme Court Committee on Evidence, 175-177, 183-184 (1963). There is every indication that what Mrs. Ferrara told the admitting physician was spontaneous and made in good faith, within a *276 very brief time after the accident, and so bears the hallmark of reliability.
Additionally, it is to be observed that even were the hospital record entry to be held technically inadmissible, it had minimum or no real prejudicial effect considered in the context of the entire case. Particularly, we have in mind the fact that Mrs. Ferrara was hit after she had crossed three lanes of traffic and was about to traverse the fourth (westbound slow lane)  a maneuver that no person in his right senses would attempt when the light was red against him.
Finally, it is claimed that a new trial should have been granted because the verdict was excessive. We have referred to Mrs. Ferrara's special damages, the severity of her injuries, the operation on her leg and her three subsequent readmissions to the hospital, the period of her wearing a cast and then walking on crutches and with a cane, her severe limp, her persistent pain, the scar she will bear for the rest of her life, her apparent aging from the accident, the abandonment of her plan to open her own beauty parlor, and her 38.46 years of life expectancy. The denial of a new trial will not be reversed unless it clearly appears that there was a manifest denial of justice under the law. Even where a trial judge believes that an award appears excessive to him  and that is not the case here  it does not necessarily follow that a judgment based thereon is the product of mistake, partiality, prejudice or passion. Andryishyn v. Ballinger, 61 N.J. Super. 386, 395 (App. Div. 1960), certif. den. 33 N.J. 120 (1960); Fritsche v. Westinghouse Elec. Corp., 55 N.J. 322, 330 (1970). On review, we will interfere with the verdict on the ground of its alleged excessiveness only with reluctance and never except in a clear case. Cabakov v. Thatcher, 37 N.J. Super. 249, 257 (App. Div. 1955). We conclude that the verdict was not disproportionate and that it was reasonably warranted by the proofs.
The judgment is affirmed.