**Dorothy HEWITT, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1624.**

Supreme Court of Alaska.

Sept. 12, 1973.

---

Lawrence J. Kulik, Asst. Public Defender, Herbert D. Soll, Public Defender, Anchorage, for appellant.

Stephen G. Dunning, Asst. Dist. Atty., Anchorage, Norman C. Gorsuch, Deputy Atty. Gen., John E. Havelock, Atty. Gen., Juneau, for appellee.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

CONNOR, Justice.

Appellant was convicted of second degree murder. The appeal turns on whether certain evidence should have been admitted as a dying declaration of the deceased victim.

On the evening of February 9, 1971, Dorothy Hewitt and N. C. Hicks shot each other. Hicks died of those gunshot wounds two months later. Although the police first suspected Hicks of being the instigator and aggressor, the state later charged Hewitt with murder of Hicks.

When Hicks was admitted to the hospital his physician, Dr. Hein, informed him that he would probably die unless he was operated on and that he might die anyway. The operation was performed about 7:30 p. m. on February 10. After the operation, Dr. Hein saw Hicks and informed him that the operation accomplished what he had intended it to accomplish and that Hicks was in better condition after the operation than before.

Dr. Hein testified at length before the judge, outside the presence of the jury, as to the apparent mental and physical condition of Hicks. He stated that Hicks was alert and in command of his faculties during the days after the operation and that he had a stoical attitude. Dr. Hein testified that Hicks' belief in his condition, namely, that he could die, did not change after the operation, but that Hicks had a hope of recovery, although a narrow one. It was Dr. Hein's opinion that Hicks probably knew without the physician's com-

ments that he was mortally injured. Dr. Hein's testimony, therefore, is somewhat equivocal.

At no time did Hicks utter his own beliefs about either a hope of recovery or sense of impending death.

On the morning of February 10, Officer Clemens of the Anchorage Police Department visited Hicks and took a statement from him, in which Hicks blamed Hewitt for starting the shootout. On the following day, Clemens returned to Hicks' bedside, read the statement to him, made Hicks' requested changes in the statement, and then signed the statement for him, since Hicks was unable to move his arms.

On approximately Hicks' third day in the hospital, at Hicks' request, the Rev. Josey visited him and heard statements from Hicks in which he claimed responsibility for the shooting.

Although, according to Hein's testimony, Hicks' belief in his physical condition did not change during the days after the operation, the trial judge admitted the statement taken by Officer Clemens as a dying declaration. He refused to admit the statement heard by Rev. Josey as either a dying declaration or as evidence to refute the written statement given to Clemens. The trial court may have been influenced by Rev. Josey's statements that Hicks told him that he had called the minister in hopes of making a fresh start on life. The jury was allowed to hear the dying declaration given to Officer Clemens. The jury was also allowed to hear Rev. Josey's opinion that Hicks felt responsible for the shooting, but was not allowed to hear the words which, according to Rev. Josey, were actually used by Hicks. The Rev. Josey was permitted to state that on four different occasions Hicks, in his opinion, was suffering from very deep feelings of remorse and guilt.

Five claims of error are made in this appeal: (1) That Hicks' statement to Officer Clemens was erroneously characterized and admitted as a dying declaration; (2) that Hewitt should have been allowed to im-

peach that dying declaration with evidence of a subsequent inconsistent statement given to Rev. Josey; (3) that Hewitt's sixth amendment right to confront witnesses against her was denied by the lower court's refusal to allow her to rebut Hicks' statement to Clemens; (4) that the trial court should have given the jury a cautionary instruction concerning a party's oral admissions, namely, the declaration to Officer Clemens; and (5) that the trial court improperly or inadequately instructed the jury about the dying declaration.

■ To be admissible as a dying declaration, the utterance must be that of a person laboring under a sense of impending death, who has abandoned all hope of recovery. C. McCormick, Evidence § 259, 555–56 (1954). As the masterful summary by Mr. Justice Cardozo puts it:

> "There must be 'a settled hopeless expectation' that death is near at hand, and what is said must have been spoken in the hush of its impending presence. Despair of recovery may indeed be gathered from the circumstances if the facts support the inference. There is no unyielding ritual of words to be spoken by the dying. Despair may even be gathered, though the period of survival outruns the bounds of expectation. What is decisive is the state of mind. Even so, the state of mind must be exhibited in the evidence, and not left to conjecture. The patient must have spoken with the consciousness of a swift and certain doom." Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933) (citations omitted.)[1]

■■ It must be kept in mind that one of the underlying reasons for admitting

hearsay is not only the unavailability of the declarant but the probability of trustworthiness of the hearsay utterance. In the case of dying declarations trustworthiness is postulated on the belief that most persons are apt to speak truthfully as they approach death. In the case at bar, the probability of trustworthiness is greatly diminished by the presence of several factors. On the evidence it is reasonable to conclude that Hicks, when he spoke to Officer Clemens, expected to recover and was motivated to give a statement condemning appellant in the hope that if he should recover he might be absolved. This possible motive to fabricate must be considered, along with the otherwise equivocal circumstantial data, in determining the admissibility of the statement.

■ In our view the testimony here was far too equivocal to render Hicks' statement to Clemens admissible as a dying declaration. Hicks' state of mind is a matter of conjecture. Even though he may have thought that death would be the progressive result of his injuries, we have no means of knowing when, in his mind, he believed that death would actually ensue. The foundation evidence fails to establish the necessary imminence of death and the abandonment of hope which would render the declaration admissible. It was, therefore, error to admit Hicks' statement to Officer Clemens into evidence.

Because of our holding on this point, it is not necessary to pass upon the other questions presented on appeal.[2] We reverse and remand for a new trial.

Reversed and remanded.

FITZGERALD, J., not participating.

---

1. Rule 804(b)(3), Federal Rules of Evidence, provides for the admissibility of:
   "A statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death."

2. We note, without deciding the issue, that there is strong authority which permits the impeachment of the deceased declarant by prior or subsequent inconsistent statements, on the ground that the dying declaration is a testimonial statement, made out of court. Carver v. United States, 164 U.S. 694, 17 S.Ct. 228, 41 L.Ed. 602 (1897); 5 Wigmore, Evidence, § 1446, 246–47 (1940).

APPENDIX

The most pertinent excerpts from Dr. Hein's testimony are the following:

Q. All right, did you have a conversation with him about his condition?

A. Yes, I did.

Q. And what did you tell him?

A. I told him on admission that he had severe multiple gunshot wounds that were life-threatening to him and that could cause him to pass away; that he needed to have surgery to correct these as much as possible and that even if—with that he might pass away.

Q. Is there any question about that he was alert enough to understand what you were talking about?

A. He was oriented—there is no question he was alert and oriented, he knew what I was saying.

Q. Now, would there by any—from your physical findings, would there by any substantial change in his condition for a couple of days at least?

A. No, there was no substantial change.

\* \* \* \* \* \*

Q. Dr. Hein, you say when he first came in you—at least at your first examination you found no total collapse of the lung, he couldn't move one of his legs but he had good pulses in both lower extremities together with the multiple gunshot wounds, is that correct?

A. That is correct.

Q. And at that time would say that death was certain? Did he have any chance at all for survival at that time?

A. Did he have any chance for survival at that time?

Q. Yes.

A. With the information that we knew at that time, yes, he did have a chance for survival at that time based on what we knew, period.

Q. Okay, now and your conversation with him, was that before you first per-

formed surgery on him when you told him what his condition was?

A. Your question has to do—when was the first conversation . . . . .

Q. Okay. fine, when was the first . .

A. . . . . . you want to know when the first conversation was?

Q. Yeah, when was the first conversation?

A. When I walked into the emergency room and saw him lying on the Gurney.

Q. You referred to—when was the first time you told him what your findings were?

A. Right then.

Q. At that time?

A. That's right.

Q. And that was before you first performed surgery on him?

A. That's right.

Q. And would you tell us as near as you can in your exact words what you told him at that time?

A. In—briefly what I said before.

Q. Okay, if you could run over that for me again, please?

A. That he had multiple gunshot wounds; each one of them could be life-threatening and cause him to pass away. These needed to be repaired as best as possible and that he might pass away in spite of this.

Q. Okay, now were these made with reference to the surgery that was upcoming? What was the surgery designed to do?

A. Your question relates what I told him in relationship to the wounds?

Q. Right.

A. Okay.

Q. And did you tell him you were going to operate?

A. Yes.

Q. And did you tell him why you were going to operate?

A. Yes.

Q. And did you tell him what the purpose of the operation would be, what it was designed to accomplish?

A. That's right.

Q. And what was that?

A. In brief, it was to—now, I didn't go over this with him. In other words, I told him that he was critically injured. . . . . .

Q. Right.

A. . . . . . that he had multiple gunshot wounds, these needed to be taken care of. To go over with him at that time more in detail would be unreasonable. He knew his condition, I defined it to him and he said go ahead and take care of it. [T. 85–87]

\* \* \* \* \* \*

Q. Okay. Did you—did the operation accomplish what you set out to have it accomplish?

A. Yes, it did, yeah.

Q. And was he then in better shape after the operation than he was before?

A. That's true. He was not losing blood because the hemorrhage had been controlled; the pleural, that is the lung on the left, had been re-expanded and he was ventilating from that. [T. 90]

\* \* \* \* \* \*

Q. Did you discuss the operation with him after you performed it?

A. Uh-huh.

Q. And when was that discussed?

A. The next morning.

Q. And do you recall about what time it was the next morning?

A. Unh-unh.

Q. Was it early morning or late morning?

A. I think we finished about 2:00, 2:30 in the morning and I saw him about 8:30, 9:00 o'clock. He was . . . . . .

Q. Now—okay. What did you tell him at that time with regard to the operation?

A. The same thing I just said.

Q. Did you tell him what—everything you told me?

A. Uh-huh.

Q. Did you tell him that the operation at least for that time had done what it was accomplished to do?

A. Uh-huh.

Q. And that he was in better condition at that time than when he had first come in?

A. But that he could have multiple complications as a result of his injury, namely, liver failure from the gunshot wound; kidney failure because of his other kidney was the only one doing the work for 2, that he had multiple transfusions; that his pancreas could dissolve itself.

Q. You mentioned those possibilities to him . . . . . .

A. Uh-huh.

Q. . . . . . is that correct?

A. That's right.

Q. As possibilities?

A. At—the morning that I saw him, yes.

Q. Now, did you at any time again—that would be the morning of the 10th?

A. That's right.

Q. Did you see him again and discuss his condition with him again that day?

A. In answer to your question, yes, and no. Yes, I saw him 2 or 3 times that same morning and similar the afternoon. I didn't discuss, reiterate what I had said each time I saw him so that part is no, I didn't tell him.

Q. That was a bad question. Now, it was during this period he did appear to be alert and in command of his faculties?

A. That's right.

Q. Was his condition improving through that day, the day of the 10th?

A. It was about stable.

Q. Did his spirits—any change in his attitude or his emotional. . . . . .

A. Not really. He was rather stoical, really didn't complain.

\*   \*   \*   \*   \*   \*

Q. Well, but—okay. I want to know what he understood, did he understand he was getting better the next day after the operation, when his spirits (indiscernible—interrupted) . . . . .

A. He understood that the things were the same, that he could well die.

Q. Did his spirits—but we've got to know the difference between whether death was—he thought death was a possibility or whether he thought death was a certainty. He had life . . . . .

A. I think he realized and I told him that he could die reasonably, that death was the reasonable outcome of his injuries.

Q. It was a reasonable possibility?

A. It was more than a reasonable possibility.

Q. But that it was not . . . . . .

A. Even after surgery I explained that death was most likely to happen.

Q. Now, your exact words are very important on this point. Did you tell him he had no hope at all of recovery?

A. About the only time I've ever used that term is somebody that has terminal cancer. I don't think I've used those terms on somebody with a traumatic injury because it's an unreasonable statement.

Q. So far as you knew, he—although he realized his chances were not good, he did realize he had some hope of recovery as narrow as that might be?

A. That's right.

Q. Now . . . . . .

A. He—he . . . . . .

Q. Did you make any prognosis as to—you say these ailments were things like, you know, what could develop with his liver and what could develop in the pancreas and what could develop (indiscernible—interrupted) . . . . . .

A. What was developing.

Q. And did you give him any time? Was death something that would happen immediately? And this is—I'm speaking about after the initial operation was over and he picked up or was it something that might occur down the trial a little bit further?

A. Other than telling him originally what his injuries were, individually that they were life-threatening, totally they were life-threatening and other than telling him that the immediate problems of hemorrhage had been controlled after surgery; that the complications, liver failure, renal failure, pancreatic inflammation, abscesses, those were reasonable likelihoods. Now, other than that, and telling him initially and right after surgery, I did not record any other change of what my conversations were with him except to tell him that they were very poor, grave prognosis, that he likely would not live.

Q. Okay. And he—you never gave him any time interval one way or the other?

A. I had no way of knowing any time. Even when he was exsanguinating on the table, there's no way of telling him how long he's going to live.

Q. Okay, so you never gave him any time?

A. Before surgery I explained to him that if surgery wasn't done promptly he would die promptly.

Q. But after surgery, after he knew that surgery had been done promptly, you never subsequently then gave him any time notice, did you?

A. I explained that the liver failure could take days to weeks. Hepatic failure could take days to weeks.

ERWIN, Justice, with whom RABINOWITZ, Chief Justice, joins concurring.

While I agree that this case should be reversed and remanded for new trial, I do

not agree with the reasoning expressed by the majority. In my view, the fatal defect in the proceedings in the trial court was the exclusion of the testimony of Rev. Josey, which was inconsistent with the dying declaration.[1] The dying declaration is a testimonial statement which can be impeached by prior or subsequent inconsistent statements.[2] Since the primary testimony against appellant was the dying declaration, it was error to permit it to go to the jury without the impeaching testimony of Rev. Josey, which would have affected the weight to be accorded such a statement by the jurors.

While I do not disagree with the majority statement of law concerning dying declarations, I feel there are sufficient facts for the trial court to determine that Hicks was "laboring under a sense of impending death"[3] and thus could give a valid dying declaration. Rarely is medical testimony absolute on the issue of pending death. Further, there is a natural constraint present in such situations which causes hesitancy in stating to the victim that there is no chance of recovery for fear of destroying whatever fragile hope of survival the will to live might provide.

Dr. Hein explained to Hicks his physical condition and his chances for survival. Dr. Hein indicated that he was satisfied in his own mind that Hicks understood his own condition. He further testified that Hicks was told that death was the most likely possibility of the shooting even after surgery, but that he never told anyone except terminal cancer patients that there was no hope at all for recovery. I find the statements though somewhat equivocal are sufficient for the trial court to conclude that Hicks was laboring under a sense of impending death.[4]

---

1. The deceased stated to Rev. Josey that he was responsible for the shooting and not appellant.

2. 5 Wigmore, Law of Evidence § 1446, at 246–47 (3d Ed. 1940) ; 3 Warren on Homicide § 260, at 83–84 (1938) ; 1 F. Wharton, Criminal Evidence § 328, at 751 (12 Ed. 1955) ; Carver v. United States, 164 U.S. 697, 17 S.Ct. 228, 229, 41 L.Ed. 602, 603 (1897).

3. C. McCormick, Evidence § 259, at 555–56 (1954).

4. "The circumstances of each case will show whether the requisite consciousness existed ; and it is poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances." 5 J. Wigmore, Law of Evidence § 1442, at 238 (3d Ed. 1940).