Elliott P. JOHNSON, Petitioner,

v.

STATE of Alaska, Respondent.

No. 3456.

Supreme Court of Alaska.

May 19, 1978.

William H. Babcock, Sitka, for petitioner.

James L. Hanley, Asst. Dist. Atty., Larry R. Weeks, Dist. Atty. and Avrum M. Gross, Atty. Gen., Juneau, for respondent.

Sue Ellen Tatter, Asst. Public Defender and Brian Shortell, Public Defender, Anchorage, amicus curiae.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

MATTHEWS, Justice.

This petition for review presents questions as to the admissibility of statements made by Elizabeth Johnson, the victim of a beating, who subsequently died as the result of her injuries.[1] Four statements were made. The first was made shortly after Mrs. Johnson's admission to the hospital on December 30, 1975 to a licensed practical nurse, Vera Marvin. Substantially the same information was conveyed by a second statement made to Dr. Michael Silver, the attending physician. The motion to suppress these statements was denied by the superior court on the basis that they were admissible as statements made for the purpose of medical diagnosis or treatment. We have concluded that the court erred in denying the motion insofar as these statements pertained to the identity of the assailant.

The other two statements were made on January 2 and 5, 1976 just prior to and three days subsequent to the victim undergoing surgery. The trial judge found that those statements were not made under such a sense of impending death as to justify their admission under the dying declaration exception to the hearsay rule. We have concluded that the court applied an unduly restrictive standard in deciding this ques-

tion and that when the proper standard is used at least the January 5 statement should be admitted.

The defendant below, Elliott P. Johnson, petitioned for review of the portion of the court's ruling that denied suppression of the first statement, and the State cross-petitioned for review from the part of the court's order suppressing the other two statements. We granted review because of the importance of the statements to the disposition of the case. There apparently are no direct witnesses to the alleged beating of Mrs. Johnson. The order pertaining to the suppression motion involves a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate and present review of the order may materially advance the ultimate termination of the litigation. Postponement of review can result in unnecessary delay and expense. Thus, the requirements of Appellate Rules 23 and 24 for granting review have been fulfilled.

## I

### THE STATEMENTS TO MEDICAL PERSONNEL

On December 30, 1975, Mrs. Johnson was taken by ambulance to the emergency room at Mt. Edgecumbe Hospital. She was attended by Vera Marvin who found Mrs. Johnson having trouble breathing and in considerable pain. Initially, due to the extent of her injuries, Ms. Marvin thought that Mrs. Johnson might have been run over by an automobile. In answer to inquiries, however, Mrs. Johnson indicated that she had been at a house party and was beaten by another man. Ms. Marvin testified:

I think that both the doctor and myself, you know it was hard to believe that it was done by a person, by beating because it looked like a car ran over her and we kept asking—I kept asking Elizabeth so finally I told Elizabeth the doctor has to know what happened to you. And like I

---

1. The court has been assisted by scholarly briefs prepared by the Public Defender Agency as amicus curiae and the Office of Attorney General in reply.

said, it looked like a car ran over her, so finally she took my wrist and pulled me over by her and she said I promised that, I promised my husband that I wouldn't tell who did it, that the story that they told was the story that they were going to stick to. She told me then that her husband beat her. Then I turned around and told the doctor and Mrs. Vinsant he had beat her.

Subsequently, Mrs. Johnson gave Dr. Silver essentially the same information.

The trial judge denied the motion to suppress this testimony based on an exception to the hearsay rule for statements made for the purpose of medical diagnosis or treatment. The exception is set forth in Rule 803(4) of the Federal Rules of Evidence as follows:

> Rule 803. *HEARSAY EXCEPTIONS: AVAILABILITY OF DECLARANT IMMATERIAL.* The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> .   .   .   .   .
>
> (4) *Statements for purposes of medical diagnosis or treatment.* Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

**2.** *See* McCormick's Handbook of the Law of Evidence § 292, at 690–92 (2d ed. 1972).

**3.** *See Cestero v. Farrera,* 110 N.J.Super. 264, 265 A.2d 387, 392–93 (1970).

**4.** McCormick states:
On the other hand, when statements as to causation enter the realm of fixing fault it is unlikely that the patient or the physician regarded them as related to diagnosis or treatment. In such cases, the statements lack any assurance of reliability and would properly be excluded.
McCormick, *supra* note 2, at 691. The Advisory Committee's Note to Federal Rule of Evidence 803(4) states in part:
Statements as to fault would not ordinarily qualify under this latter language. Thus a patient's statement that he was struck by an automobile would qualify but not his statement that the car was driven through a red

The Alaska Supreme Court is presently considering the adoption of evidence rules containing a provision identical to this rule.

■ Statements of a patient as to presently existing body conditions are generally admitted as evidence of the facts stated because there is a high likelihood of truthfulness resulting from the patient's belief that the doctor will rely on such statements in his diagnosis and treatment.[2] Where statements going to the cause of a patient's condition relate information desirable for diagnosis and treatment, they are also admissible based on the same indicia of reliability.[3] Thus, the trial court was correct in admitting Mrs. Johnson's statements as to the general cause of her condition. The statements, however, also revealed the identity of her alleged assailant. This information did not relate to diagnosis or treatment, and as to that portion of the statements, the court's denial of the motion to suppress was erroneous. The situation presents the same distinction identified by McCormick and the commentary on the Federal Rules of Evidence, between general statements made going to the cause of injury which are important to diagnosis and treatment, and statements entering the realm of fixing fault.[4] Since statements fixing fault and indicating the identity of an assailant are not relevant to medical diagnosis or treatment,[5] they lack assurances of reliability and should be excluded.[6]

light. Under the exception the statement need not have been made to a physician. Statements to hospital attendants, ambulance drivers, or even members of the family might be included.
Moore's Federal Practice, Rules Pamphlet Part 2, Federal Rules of Evidence, at 834 (1975).

**5.** We do not reach the question of statements made to a psychiatrist which may be relevant to psychiatric diagnosis or treatment.

**6.** We have been presented with no criminal case in which statements pertaining to the identity of an assailant have been admitted into evidence under this exception to the hearsay rule. The case of *People v. Gant,* 58 Ill.2d 178, 317 N.E.2d 564, 569 (1974), cited by the state, permitted testimony of a doctor as to statements of the victim as to the nature of her wound and the fact that she knew the assail-

## II

## DYING DECLARATIONS

On January 2, 1976, Mrs. Johnson's condition worsened, with increased abdominal pain and signs of internal bleeding. It was decided that surgery was required. Because of her critical condition and the possibility that she might not survive surgery, a consulting physician, Dr. George Longenbaugh, called the Sitka Police Department to inform them of the situation. Dr. Longenbaugh told Mrs. Johnson that her condition was very serious and that she might not survive surgery. He testified:

Q  Do you feel that she was in a condition such that she could understand what you were saying to her?

A  I believe so. Her uh—she was (Indiscernible) appropriately and seemed clearer mentally than she had at the time of the first examination.

Q  Do you have an opinion as to whether or not at that time following your explanation, Elizabeth Johnson would have been laboring under a sense of impending death?

A  I believe so. I certainly warned her of the gravity of the situation. Yes.

Sgt. Edgar Thornton of the Sitka Police Department interviewed Mrs. Johnson in mid-afternoon on January 2, 1976, shortly before she underwent surgery. Mr. Johnson was present. Sgt. Thornton testified:

A  Well, I asked her who had beaten her up and she stated she didn't know. I then asked her if she and her husband had had an argument and she said I think so. I asked her if she and her husband had had a fight and she said yes. I asked if her husband had hit her and she stated she didn't know or didn't remember. I then asked her if she was married to Elliott Johnson and she stated that they had been married in March 1974. I asked her if Elliott Johnson had beaten her up and she stated he may have, we were

alone and started drinking. I also asked her if she knew what her condition was. She said she did.

Q  Did she indicate if she knew whether or not she was hurt if she was hurt slightly or badly?

A  She indicated to me that she knew she was seriously hurt.

The surgery revealed that among other injuries, Mrs. Johnson's pancreas had been ruptured. Upon discovering this, Dr. Longenbaugh believed that it was extremely unlikely that she would survive.

Dr. Longenbaugh told Mrs. Johnson after her surgery that she was gravely ill and that her chances of survival were not good. He testified that he regarded it as generally unsound medical practice to tell a patient he was absolutely certain to die, since that would depress him and further reduce his already small chances of recovery. Dr. Silver agreed with Dr. Longenbaugh that Mrs. Johnson was in very grave condition following surgery, and personally told her that before January 5. She was then, according to Dr. Silver, aware that there was a good possibility that she would die.

On January 5, 1976, three days after the surgery, Sgt. Thornton again interviewed Mrs. Johnson. Sgt. Thornton testified that, prior to the taping of her interview, Mrs. Johnson advised him that she had consulted a priest. The tape recording of that interview revealed the following:

Q  .  .  .  Elizabeth Marie Johnson, do you know the seriousness of your condition?

A  Yes, Dr. Longenbaugh explained it to me.

Q  Dr. Longenbaugh told you how serious it could be?

A  Yah, he told me I was (Indiscernible) .  .  ..

Q  Did your husband, Elliott Johnson, beat you like this?

A  I think so. Like I said before, we were talking the next morning and he

ant. The statement did not reveal the identity of the assailant; and to the extent that it did not deal with the general cause of the wound,

we do not believe it should have been admitted under this exception to the hearsay rule.

told me if I told him where the money was he wouldn't have beat me up. So I guess he did.

Q Did you hide the money from him?

A Yes, before we went out drinking, I took just enough to get a car. We had to meet some friends and we went to their place.

Q And when you got back did you tell me awhile ago that you forgot where you hid the money?

A Yah.

Q What was the last thing you remember?

A That's the only.

Q You just remember him hitting you?

A No, after I woke up at 9:00 o'clock the next morning . . . .

Q Do you remember what morning that was?

A No I don't. It was the same morning I came over here.

Q The same morning?

A Yah.

Q Did you say anything to him at the time?

A I kept asking him to take me to the hospital.

Q Did you know that you had been beaten up then?

A Yah, I had a black eye and could hardly breathe.

Q Did he make a statement to you then?

A No.

Q Did he tell you that it wouldn't have happened if you had given him the money?

A Yah, all he said. My mouth is dry, can I take this out for awhile? It sure dries out my throat.

As we have indicated previously, the trial court granted the motion to suppress these two statements.

The admission of dying declarations, under certain conditions, is a well-recognized exception to the rule excluding hearsay testimony. Two basic reasons have been advanced for admission of such testimony: necessity, because of the witness' death, and a belief that the approach of death removes ordinary motives to misstate.[7]

In *Hewitt v. State,* 514 P.2d 6 (Alaska 1973), we discussed the subject of dying declarations. The facts in the case revealed that Hicks and Hewitt shot each other in a gunfight. A doctor informed Hicks that he would probably die unless he was operated on, and that he might die anyway. Immediately before surgery, a police officer took a statement from Hicks in which he blamed defendant Hewitt for starting the shooting. Three days after the surgery, Hicks contradicted his previous statement, saying that he, rather than Hewitt, was responsible for starting the shooting. The trial judge admitted the statement taken before surgery as a dying declaration, but refused to admit the subsequent statement in which he took the blame himself. On appeal, four justices participated. Justice Connor, joined by Justice Boochever, held that the statement given to the police officer was not a dying declaration, and indicated that the proper standard required abandonment of all hope of recovery:

> To be admissible as a dying declaration, the utterance must be that of a person laboring under a sense of impending death, who has abandoned all hope of recovery.

*Id.* at 8.

Justice Erwin, with whom Justice Rabinowitz joined, held that there was no error in admitting the statement made to the police officer. He indicated no basic disagreement with Justice Connor's statement of the law concerning dying declarations, but expressed the applicable standard as "laboring under a sense of impending

---

7. V Wigmore, Evidence, § 1431, 1438 (Chadbourn rev. 1974); McCormick, *supra* note 2 at 680–81, 2 Wharton's Criminal Evidence, § 315 (13th ed. 1972). The advisory committee on the Federal Rules of Evidence noted, concerning the latter reason:

> "While the original religious justification for the exception may have lost its conviction for some persons over the years, it can scarcely be doubted that powerful psychological pressures are present."

death" without also requiring that the declarant abandon all hope of recovery. *Id.* at 12. Justice Erwin stated:

> Rarely is medical testimony absolute on the issue of impending death. Further, there is a natural constraint present in such situations which causes hesitancy in stating to the victim that there is no chance of recovery for fear of destroying whatever fragile hope of survival the will to live will provide.

*Id.*

It is the state's contention that the trial court erred by applying an incorrect standard. It argues that a requirement that one must abandon all hope of recovery is not realistic because doctors rarely indicate to a patient that there is no hope of recovery.

The recently enacted Federal Rules of Evidence no longer require abandonment of all hope of recovery. Rule 804(b)(2) provides:

> (b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the decedent is unavailable as a witness:
>
> .    .    .    .    .
>
> (2) *Statements under belief of impending death*—In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.

The proposed Alaska Rules of Evidence 804(a)(2) similarly demands only that the statement be made "by a declarant while believing that his death was imminent."

■ We believe that to require that the declarant have abandoned all hope of recovery is overly demanding.[8] In light of modern medical science it is rare indeed that all hope of recovery is abandoned, yet a victim may be aware of the probability that his death is impending to the extent necessary to create sufficient solemnity to give adequate assurance of the trustworthiness of his testimony. What is required for a dying declaration to be admissible is that the declarant have such a belief that he is facing death as to remove ordinary worldly motives for misstatement. In that regard, the court may consider the totality of the circumstances including the presence or absence of motive to falsify and the manner in which the statement was volunteered or elicited.

The trial judge in his decision on the motion to suppress in this case expressed his conclusions in terms of the "abandonment of all hope" standard.

> .    .    .    I just can't as a finder of fact establish that first of all  .    .    . that all hope was abandoned  .    .    .. I just do not feel the facts are strong enough to say that she was overwhelmed by the death possibility.   .    .    .

■ We believe that when the proper standard is used—awareness of impending death—the admission of at least the recorded statement made by Mrs. Johnson on January 5 is required.[9] It was then ex-

---

**8.** In adopting a more inclusive dying declaration standard we are influenced in part by those authorities holding that all statements of deceased persons, not merely dying declarations, should generally be excepted from the hearsay rule. *See* Wigmore, *supra* note 7, §§ 1427, 1576 and 1577. This approach was adopted in different forms by the American Law Institute in the Model Code of Evidence, Rule 503(a), and the Commissioners on Uniform State Laws in the Uniform Rules of Evidence, Rule 63(4)(c). The Uniform Rules have been adopted in modified form in Kansas, New Jersey and Utah. *Id.* § 1577 at n. 15. Proposed Federal Rule of Evidence 804(b)(2) encompassed the same concept; while this proposed rule was not accepted by Congress, it was

adopted by the states of Arkansas, New Mexico and Wisconsin. *Id.* § 1577 at n. 16 (Supp. 1977).

In civil cases in Alaska involving the personal representatives of deceased persons, statements of deceased persons are generally admitted pursuant to Alaska Civ.R. 43(g)(4). Variants of the same rule exist in Connecticut, Rhode Island, California, Massachusetts, Oregon and Virginia. *Id.* § 1576, at 531–533.

**9.** Because Mrs. Johnson's medical situation was not known to be so grave on January 2 when she made her first statement to Sgt. Thornton, the question whether that statement is admissible as a dying declaration is closely

tremely unlikely that she would survive and she had been advised by two physicians of the gravity of her condition. She was conscious and alert. In the opinion of the only physicians asked to express an opinion, she was laboring under a sense of impending death. She had consulted a priest.[10] Further we find no evidence tending to show that she was not aware that there was a high probability that she would soon die.[11]

Petition for Review granted. Trial court order affirmed in part and reversed in part. Remanded for proceedings consistent with this opinion.

CONNOR, Justice, concurring.

I concur in the holding that Elizabeth Johnson's statements on January 5, 1976, and afterward were admissible as dying declarations.

However, I think this case can be brought within the traditional criterion of "abandoned hope" which was stated in *Hewitt v. State*, 514 P.2d 6, 8 (Alaska 1973). In the case at bar the declarant did not have the same motive to fabricate as did the declarant in *Hewitt*. Moreover, the circumstances here present a much greater probability as to the imminence of death, and from these circumstances we can infer that Elizabeth Johnson was aware of the severity of her injuries and of the great likelihood that she might not survive. In my opinion a sufficient circumstantial showing was made to permit the inference that she spoke "with the consciousness of a swift and certain doom." *Shepard v. United States*, 290 U.S. 96, 100, 54 S.Ct. 22, 24, 78 L.Ed. 196, 199 (1933).

We should not adhere to a rigid formalism in applying the rules of evidence. But it is not because of blind adherence to formalism that the "abandonment of hope" limitation should be retained. Rather, it is that the principles underlying this exception to the hearsay rule should cause us to adhere to traditional requirements.

The dying declaration rule rests upon certain assumptions about human nature which may in themselves be highly questionable. Like many such rules it evolved historically, and it has become considerably ossified within narrow limits.[1] But at least those limits render the rule easy to apply except in a few marginal situations.

The rule assumes that the declarant will be more truthful than others, without reference to the personal characteristics of the declarant. The judicially created limitations on the use of dying declarations have their origins, no doubt, in the inherent danger of giving too much credence to the assumptions underlying the rule. As Professor McCormick observed:

"It is arguable that a belief in the mere probability of impending death would make most men strongly disposed to tell the truth and hence guarantee the needed special reliability. But belief in the certainty of impending death, not its mere likelihood or probability, is the formula insisted on and rigorously applied. Perhaps this limitation reflects some lack of confidence in the reliability of 'deathbed' statements generally."

C. McCormick, *Handbook of the Law of Evidence* § 282, at 680 (2d ed. 1972). Until we substitute by positive enactment a new rule,[2] I see no reason to discard the common

---

balanced. We leave its resolution to the trial judge.

**10.** This has been regarded as an important factor. *See Conner v. State*, 225 Md. 543, 171 A.2d 699 (1961); *Carver v. United States*, 164 U.S. 694, 17 S.Ct. 228, 41 L.Ed. 602 (1897); and other cases collected at 2 Wharton's Criminal Evidence § 324 at 144 n. 11 (13th Ed. 1972).

**11.** Before Mrs. Johnson's statement is presented to the jury, the trial judge may wish to give a cautionary instruction similar to that given in

*Beech Aircraft Corp. v. Harvey*, 558 P.2d 879, 890 (Alaska 1976).

**1.** Some of these limits may have resulted from a mishandling of precedent. *See* C. McCormick, Handbook of the Law of Evidence §§ 282–83 (2d ed. 1972); V Wigmore, Evidence §§ 1431–32 (Chadbourn rev. 1974).

**2.** The rule could be broadly modified, or the hearsay rule as to declarations by deceased persons concerning their assailants could be abandoned altogether.

law criteria of admissibility. Those criteria reflect a certain accumulated wisdom about the dangers of admitting dying declarations too readily. Until convinced of the desirability of a new rule, I would adhere to all of the elements of the traditional rule.

BOOCHEVER, Chief Justice, with whom RABINOWITZ, Justice, joins, dissenting.

I agree with the opinion that the exception to the hearsay rule of statements made for medical diagnosis or treatment is inapplicable where a statement is made for the purpose of revealing the identity of an assailant.

I also agree as to the requirements for admission of dying declarations. To the extent that *Hewitt v. State,* 514 P.2d 6 (Alaska 1973), may be construed as requiring that the utterance be made by one who has abandoned all hope of recovery, it should be overruled. It is rare indeed that all hope of recovery is abandoned, and a victim's general awareness that his death is impending can create sufficient solemnity to assure the trustworthiness of the testimony. Of course, death is always impending in one sense, for everyone:

But at my back I always hear

Time's winged charriot hurrying near.[1]

There must be a belief that the likelihood of death is so imminent as to remove ordinary worldly motives for misstatement. I further agree that the court may consider the totality of the circumstances including the presence or absence of motive to falsify and the manner in which the statement was volunteered or elicited. Of course, the fact that the declarant is not available for cross-examination and demeanor observation must also be considered.

The trial judge in his decision on the motion to suppress in this case appropriately endeavored to make findings of fact as to the deceased's state of mind at the time she made the declarations. He considered the

pain she was undergoing. As a countervailing factor, he noted that the internal nature of the injury to the pancreas might not create an awareness of its critical nature. Judge Craske stated:

. . . I just can't as a finder of fact establish that first of all there was that all hope was abandoned. I think that it's agreed that lack of situation really wasn't conveyed to the decedent by the doctors, . . . . . But I don't find both in terms of when the death actually occurred, I think it was on February 2, that the total mental structure of the deceased at that time was so focused on death that the statements made would lose any relevance to her returning to a marital state with the defendant. One always has to be careful in these situations that the animosity or motives of the victim would enter into what you (garbled) might say

. . . .

The decision as to whether a dying declaration has been made with awareness of impending death is for the trial judge to resolve, and not the jury.[2] In reviewing that decision, we must give great weight in favor of the correctness of his ruling, since he has had the opportunity of observing the witnesses. We shall apply the same standard of review as for other findings of fact made by a trial judge: such findings will not be set aside unless clearly erroneous. A finding is not clearly erroneous unless the reviewing court is left with the firm conviction on the entire record that a mistake has been committed.[3]

The majority believes that the circumstances surrounding the January 5 statement, made almost a month prior to Mrs. Johnson's death, compel a finding that it was made under an appropriate awareness of impending death. In other words, the majority takes the position that there exists no issue to be decided by the trier of fact.

1. Andrew Marvell, To His Coy Mistress (1650–52).

2. 2 Wharton's Criminal Evidence, § 345 at 173 (13th ed. 1972); V Wigmore on Evidence, § 1451 at 317 (Chadbourn ed. 1974).

3. *Beech Aircraft v. Harvey,* 558 P.2d 879, 886–87 (Alaska 1976); *Love v. State,* 457 P.2d 622, 630–31 (Alaska 1969).

Certainly, Sgt. Thornton's statement that Mrs. Johnson had advised him that she had consulted a priest would normally be strong evidence of awareness of impending death, but the reasons for the consultation were not brought out. There is no indication that last rites were performed or requested, and the statement pertaining to the priest was not included in Mrs. Johnson's taped interview.. The doctors advised her of the seriousness of her condition, but still gave her hope of recovery. The nature of her actual awareness of impending death must be determined from inferences. The portions of the taped interview involving Mrs. Johnson's impression of Dr. Longenbaugh's advice unfortunately is garbled. Moreover, the significant portions of the statement pertaining to the involvement of her husband were at one time denied by Mrs. Johnson and eventually were elicited by leading questions. While a review of the facts of this case presents circumstances from which a trier of fact could well conclude that Mrs. Johnson had such an awareness of impending death as to justify admission of the declarations, I conclude that the question should properly be left to the trier of fact who has the opportunity of observing the witnesses.

Because Judge Craske seemed to rely on the "abandonment of hope test" referred to in *Hewitt,* I would remand the matter to the superior court for reconsideration of its ruling, in light of the standard set forth in the majority opinion.